**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**AT LEXINGTON**

**CIVIL ACTION NO. 13-366-DLB-REW**

**ACUITY BRANDS, INC., et al.**                                      **PLAINTIFFS**

**vs.**                    **MEMORANDUM OPINION AND ORDER**

**SHANE BICKLEY, et al.**                                      **DEFENDANTS**

*******************

## I.      Introduction

Plaintiff Acuity Brands Lighting, Inc. ("Acuity Lighting"), together with its parent company, Plaintiff Acuity Brands, Inc. ("Acuity Brands"), initiated this civil action against two of its former employees, Defendants Shane Bickley and Michael Robinson.  Plaintiffs allege that Bickley and Robinson breached several restrictive covenants embedded in a Stock Notification and Award Agreement, tortiously interfered with business relations and violated the Kentucky Uniform Trade Secrets Act ("KUTSA").  Plaintiffs also claim that Bickley and Robinson's current employer, Defendant Delta T Corporation, doing business as Big Ass Fan Company ("Big Ass Fans"), tortiously interfered with contractual relations.  Bickley, Robinson and Big Ass Fans now move for summary judgment, arguing that Plaintiffs have failed to prove various elements of each claim.  The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

## II.     Factual and Procedural Background

Acuity Lighting is a Georgia-based corporation that manufactures lighting solutions

1

for use in a variety of indoor and outdoor settings. (Doc. # 67 at 4). It is the sole source of revenue for its publicly-traded parent company, Acuity Brands. (*Id.*). Acuity Lighting generates some revenue from national accounts;[1] however, it focuses on selling its products to independent sales agents who represent other lighting companies. (Docs. # 120-8, 120-15, 123-3 and 168-3 at 5-6). These lighting companies sell Acuity Lighting's products to other middlemen distributors, rather than end-user customers. (Docs. # 120-8 and 120-15).

Acuity Lighting employs several Regional Sales Vice Presidents ("RSVPs"), who are responsible for cultivating relationships with these agents, recommending product pricing and setting agency sales targets in their assigned regions. (Doc. # 12). Simply put, the RSVPs drive the sale of Acuity Lighting's products. (Docs. # 120-15 and 120-16). Bickley served as the RSVP for Acuity Lighting's South Central Region (which includes Texas, Oklahoma, Arkansas, Louisiana, Mississippi and New Mexico) from April 2010 to March 2013. (Docs. # 120-15 and 168-5 at 43). Robinson served as the RSVP for Acuity Lighting's Midwest Region (composed of Kentucky, Ohio, Indiana, Michigan, Illinois, Wisconsin and the city of St. Louis, Missouri) from January 2011 to May 2013. (Docs. # 120-16 and 168-2 at 29, 53).

Each year, Acuity Brands awards shares of its stock to key Acuity Lighting employees, including RSVPs. (Doc. # 170-13 at 3). As consideration for these awards, employees must execute a Stock Notification and Award Agreement using Acuity Brand's electronic acceptance software. (Doc. # 120-2 at 5). In Fall of 2012, Acuity Brands

---

1) Acuity Lighting's national accounts structure involves either a direct sale to the end-user or a sale to a local agency servicing the end-user. (Doc. # 123-3 at 34 and 168-3 at 6-7).

2

awarded Bickley 420 restricted shares of common stock.  (Docs. # 120-2 and 168-7 at 10).

Robinson received 560 restricted shares of common stock around the same time.[2]  (Docs.

# 120-3 and 168-2 at 33).   Both men electronically executed a copy of the Agreement,

which imposed several post-employment restrictive covenants pertaining to non-solicitation,

non-competition and confidentiality on them.  (Docs. # 120-2 and 120-3).  These covenants

were all set forth in Exhibit A, entitled "Confidentiality, Inventions, Non-Solicitation and Non-

Competition Provisions," which was attached and incorporated by reference into the

Agreement itself.[3]  (Doc. # 120-2 at 5-8).  The Agreement also included a return of property

clause, which required departing employees to promptly return all company property to

Acuity Lighting.[4]  (*Id.*).

In the early months of 2013, a national recruitment firm contacted Bickley about an

employment opportunity at Big Ass Fans, a Kentucky-based company that manufactures

and sells low-speed high-volume fans.  (Doc. # 120-15 at 1).  Bickley pursued the

opportunity and received an offer of employment from Big Ass Fans.  (*Id.*).  He told

2) In 2011, Bickley and Robinson received similar stock awards, and in return, they executed almost identical Stock Notification and Award Agreements.  (Docs. # 120-2 and 120-3).  The only substantive difference between the 2011 and 2012 Agreements is the term of the non-compete covenant.  (Doc. # 67-1).   The 2011 Agreement imposes a two-year term, while the 2012 Agreement imposes a one-year term.  (*Id.*; Doc. # 120-2).  The parties agree that the 2012 Agreement is at issue in this lawsuit.  (Docs. # 120-1 at 1 and 168 at 3-5).

3) Specifically, the Agreement states that the stock award is "conditioned upon Grantee's acceptance of the terms of this Agreement and Exhibits A and B, as evidenced by Grantee's execution of this Agreement or by Grantee's electronic acceptance of the Agreement in a manner and during the time period allowed by the Company."  (Doc. # 120-2 at 5).

4) Although this is the Stock Notification and Award Agreement is the only one referenced in Plaintiffs' Third Amended Complaint, the record indicates that Acuity Lighting also required its employees to sign a Confidentiality, Inventions and Non-Solicitation Agreement as part of its annual ethics training.  (Doc. # 168-8 at 10-15).  As its very name suggests, this Agreement also imposed restrictive covenants on employees.  (Doc. # 168-8 at 21-26).  Bickley and Robinson admit that they went through such training.  (Docs. # 168-8 at 10-15 and 168-9 at 8-10).

Robinson, his friend and colleague, about the offer.  (Doc. # 168-2 at 15).  Robinson, a Kentucky native who was unhappy with his current role at Acuity Lighting, asked Bickley to recommend him for the position if he declined the offer.  (*Id.*).  Bickley promised to do so, but ultimately accepted the offer.  (*Id.*).

Around this time, Big Ass Fans's Director of Human Resources, Scott Nielsen, asked Bickley whether Acuity Lighting had imposed any post-employment restrictive covenants on him.  (Docs. # 168-8 at 16 and 168-11 at 7).  Bickley admitted that he was subject to restrictive covenants.  (*Id.*).  However, he told Nielsen that the covenants, as he understood them, simply precluded him from working with certain lighting companies.  (*Id.*).  He also stated that his wife, an attorney, had examined the covenants and did not believe that his employment with Big Ass Fans would run afoul of them.  Nielsen did not actually review a copy of the Stock Notification and Award Agreement at that time.  (*Id.*).

In March 2013, Bickley voluntarily terminated his employment with Acuity Lighting.  (Doc. # 120-15 at 3-4).  He returned the company cell phone and laptop to the Human Resources Department.  (*Id.*).  However, he failed to return a flash drive, which contained PowerPoint presentations for Acuity Lighting clients.  (*Id.*).  According to Bickley, he did not purposefully retain the flash drive; he simply forgot to include it with the rest of the items returned.  (*Id.*).

Bickley assumed the Vice President of Sales position at Big Ass Fans and began supervising a 150 person inside sales force.  (Doc. # 120-15 at 3).  He did not have any profit and loss responsibility or pricing control.  (*Id.*).  Although Big Ass Fans was exploring

opportunities in the lighting industry at that time,[5] Bickley was only responsible for the sale of fans. (*Id.*). However, a month into his employment, Big Ass Fans's CEO, Carey Smith, asked Bickley to go to a lighting trade show. (Doc. # 168-5 at 15-16). He also got invited to meetings with Business Development Manager Tom Greinke and Engineer Isaac Fedyniak, who were spearheading Big Ass Fans's efforts to enter the lighting industry. (*Id.* at 12).

About a month later, Robinson contacted Bickley about employment opportunities at Big Ass Fans. (Doc. # 168-2 at 16-20). Bickley told Robinson to send him a copy of his resume and promised to forward it to the Human Resources Department. (*Id.*). Robinson did so, and by early April, he had an interview with Big Ass Fans. (*Id.* at 68-70). The day before the interview, Robinson emailed Bickley and asked him for information about his interviewers, Scott Nielsen and Big Ass Fans Manager Ed Quinn. (*Id.* at 17-18). Bickley sent him charts detailing Big Ass Fans's organizational structure. (*Id.*). The next day, Robinson interviewed with Nielsen and Quinn, then had lunch with them. (*Id.* at 24). The record indicates that Nielsen and Quinn invited Bickley to both of these events, but he was not able to attend. (*Id.* at 71). That day, Bickley texted Robinson a picture of a hat with a Big Ass Fans logo on it. (Doc. # 168-7 at 19, 68-69). The caption said "Got you a hat." (*Id.*). He later informed Robinson that Big Ass Fans wanted to interview him again. (*Id.*). Bickley coordinated the interview with Nielsen and Robinson via email. (*Id.*).

---

5) The record indicates that Big Ass Fans "began exploring the potential for selling energy efficient lights to its end-user fan customers in 2011." (Doc. # 123-2 at 3). According to both Bickley and Big Ass Fans' in-house counsel, Joseph Miller, a special sales group worked on lighting sales until the launch of the Big Ass High Bay LED in early 2014. (*Id.*; Doc. # 120-15 at 3-4).

Before Robinson's second interview, he and Bickley exchanged text messages, expressing excitement about the prospect of working together again:

| | |
|---|---|
| Shane: | Looking forward to Monday, buddy. |
| Mike: | Can't wait to see how the announcement goes Monday. We are all in Conyers later in the week for a Mark Black mtg.  On the 2014 plans. |
| Shane: | If we offer you a deal Tuesday, you won't have to go :-) |
| Mike: | Don't tease me! |
| Shane: | Get ready – assuming all goes well Monday, we'll look to do something pretty quickly! |

(Doc. # 168-7 at 54).

On Monday, Robinson met with Nielsen, Smith and Big Ass Fans's International Sales Manager, Paul Lauritzen.  (Doc. # 168-2 at 24-25).  Bickley also attended the interview.  (Doc. # 168-7 at 20).  He sent Robinson a text saying "Great job!" afterwards.  (*Id.* at 54).  Bickley and Robinson met for dinner with their spouses that night.  (*Id.* at 20).  The next morning, Bickley sent Robinson another text message: "Scott will be reaching out to you soon – start figuring out what makes sense $ wise to make a move, we'll go from there!"  (*Id.*).  The two men exchanged more text messages over the next few days, criticizing some of Acuity Lighting's new hires and discussing Robinson's potential departure.  (*Id.* at 51).

Robinson received a formal employment offer from Big Ass Fans in May of 2013.  (Doc. # 168-2 at 12).  He accepted the offer and informed Acuity Lighting that he was voluntarily terminating his employment.  (*Id.* at 39).  Robinson had a significant amount of personal information stored on his Acuity Lighting laptop, so before returning it to the

6

company, he saved the entire contents on an external hard drive.  (*Id.* at 45-46).  Robinson insists that he was not trying retain any sensitive information about Acuity Lighting.  (*Id.*). One week later, Robinson started working at Big Ass Fans.  (Doc. # 120-16 at 1).  He was primarily responsible for building a bid-specification/new construction channel for the company.  (*Id.*).

Shortly thereafter, Acuity Lighting's Human Resources Manager, Chad Sheffield, reviewed the contents of the cell phone Robinson returned.  (Doc. # 168-3 at 10-11, 14-15). He discovered the text messages sent to and from Bickley about the interview process and wondered whether these communications violated their restrictive covenants.  (*Id.* at 14-15).  Sheffield promptly contacted Acuity Lighting's in-house counsel, Frank Whitaker, about the issue.  (*Id.*; Doc. # 168-1 at 12).  Whitaker sent a "cease and desist" letter, complete with copies of the Stock Notification and Award Agreement, to Big Ass Fans' in-house counsel, Joseph Miller.  (Docs. # 120-4 at 8 and 120-24).  When Miller received the letter, he reviewed the covenants and asked Bickley and Robinson about their communications.  (Doc. # 168-10 at 5-9).  Both men told Miller that Robinson had reached out to Bickley about employment.  (*Id.*).  Miller instructed them both to refer any future employment inquiries to the Human Resources Department.  (*Id.*).  Miller then convened a conference call with Whitaker and stated that Bickley and Robinson had not violated their covenants.  (*Id.*; Doc. # 120-4 at 8-10).

Meanwhile, Sheffield also relayed his concerns to Acuity Lighting's Senior Vice President of Sales and Marketing, Geoffrey Marlow, who had already heard rumors about Big Ass Fans from several of the company's agents.  (Docs. # 168-3 at 10-11, 14-15 and 168-4 at 13-14).  While some of these agents simply thought that Big Ass Fans wanted to

sell fans through their agency, others got the impression that Big Ass Fans was trying to establish a lighting division.  (Doc. # 168-4 at 14-17).   Marlow soon discovered that Robinson had approved Big Ass Fans as an Acuity Lighting distributor prior to his departure.  (*Id.*).  Big Ass Fans had also placed a large order of I-Beam LED lights, one of Acuity Lighting's most popular products, on behalf of a Canadian customer.  (*Id.*).  Moreover, Big Ass Fans was trying to negotiate a private labeling arrangement that would allow it to resell I-Beam LEDs bearing its logo.  (*Id.*).  Acuity Lighting immediately placed a hold on the order and requested a conference call with Big Ass Fans.  (*Id.* at 17-20).

In June of 2013, Whitaker spoke with Miller and Smith.  (Doc. # 168-1 at 21-22).  As CEO of Big Ass Fans, Smith assured Whitaker that the company would continue selling fans, but had no plans to compete with Acuity Lighting.  (*Id.*).  He also stated that he would not allow Bickley to work on any lighting-related projects, nor would he permit Bickley or Robinson to communicate with Acuity Lighting employees about employment opportunities. (*Id.*).  With these assurances in mind, Acuity Lighting released Big Ass Fans's order.  (Doc. # 168-4 at 20-25).

This incident inspired Big Ass Fans to consider manufacturing a light themselves. (Doc. # 120-5 at 3).  They came up with the Big Ass High Bay LED, which is very similar to Acuity Lighting's I-Beam in terms of form and function.  (*Id.*).  Big Ass Fans even crafted an ad, which showed the I-Beam[6] being crushed by a pickup truck while the Big Ass High Bay supported its weight.  (Doc. # 168-20).   However, Big Ass Fans intended to sell their

---

6) The ad does not identify the crushed light as the I-Beam.  (Doc. # 170-4 at 3).  It is simply labeled as the "Leading LED Brand."  (*Id.*).  However, testimony from Bickley and Fedyniak confirms that it is indeed the I-Beam.  (Doc. # 170-8 at 3).

8

light in the renovation/retrofit market, not the new construction market that Acuity Lighting targeted. (Doc. # 120-11 at 3).

Around this time, Bickley contacted another Acuity Lighting employee, Jonathan Archer, about an employment opportunity at Big Ass Fans.[7] (Doc. # 168-13 at 4). According to Archer, Bickley reached out to him because he knew that Archer was frustrated about some recent changes at Acuity Lighting. (*Id.*). Bickley instructed Archer to submit a resume. (*Id.*). Once Archer did so, Bickley explained that he would not be able to discuss the issue further, but he expected someone from Human Resources to contact Archer. (*Id.*). However, Archer did not hear from Big Ass Fans about an interview. (*Id.*).

In August of 2013, Smith invited Bickley to participate in an interview of Acuity Lighting's Vice President of Marketing David Grimm. (Doc. # 168-8 at 6). Bickley sat in on the interview, but did not ask any questions. (*Id.*). That same month, Jay Dantzler, one of Acuity Lighting's Regional Sales Managers, contacted Bickley about possible employment opportunities with Big Ass Fans in the Dallas area. (Doc. # 168-6 at 14). Bickley promised to put Dantzler in touch with Jayne Jarvis, who worked in Human Resources. (*Id.*). Dantzler interviewed with Jarvis via phone, then sent Bickley an email thanking him for his assistance. (*Id.* at 37-38). Bickley responded that the interview went well and that Big Ass Fans wanted to schedule another interview in Kentucky. (*Id.*). Once the interview was scheduled, Bickley emailed Dantzler and told him who would be picking him up from the

_____

7) The record also suggests that Bickley communicated with John Kirkhoff, another Acuity Lighting employee, about possible employment opportunities at Big Ass Fans. (Doc. # 168-12 at 9-11). Kirkhoff does not recall who initiated the conversation or when it took place, but he sent Bickley his resume with the understanding that Bickley would forward it to Human Resources. (*Id.*). Bickley told Kirkhoff that Big Ass Fans was interested in him, but Kirkhoff ultimately accepted employment elsewhere. (*Id.*).

airport and taking him to dinner that night.  (Doc. # 168-7 at 70).  He also said, "Time permitting, Mike and I will take you tomorrow to lunch.  I'll drop you back at the airport." (*Id.*).

On the day of the interview, Dantzler spoke with Bickley for about ten minutes when he arrived.  (Doc. # 168-6 at 25-27).  Afterwards, Robinson took him to lunch, then Bickley took him to the airport.  (*Id.* at 27).  Soon after, Dantzler asked Jarvis if she could send him contact information for his interviewers because he wanted to write them a thank you note. (Doc. # 168-7 at 72).  Jarvis asked him to contact Bickley for it.  (*Id.*).  Dantzler did so, and Bickley promptly sent him the requested information.  (*Id.*).  Bickley also sent Dantzler a video clip from an episode of America's Got Talent, which featured a Big Ass Fan in the background.  (Doc. # 168-6 at 29-30, 44).

In September 2013, Dantzler received and accepted an employment offer from Big Ass Fans.  (*Id.* at 31).  Bickley was copied on several emails between Dantzler and Jarvis discussing the details of the offer.  (*Id.* at 42).  He resigned from Acuity Lighting and turned in his electronic devices.[8]  (*Id.*).  Sheffield reviewed the devices and discovered correspondence between Bickley and Dantzler.  (Doc. # 168-3 at 17).  This discovery prompted Acuity Lighting to file the instant action against Bickley, Robinson and Big Ass Fans.  (*Id.*; Doc. # 1).

Just before Acuity Lighting filed suit, Bickley informed Archer that there was another job opening at Big Ass Fans and that Human Resources would contact him.  (Doc. # 168-

---

8) On March 21, 2014, Acuity Lighting sued Dantzler separately in the District Court of Dallas County, Texas for breach of contract (specifically, the return of property, non-disclosure and trade secret provisions) and violations of the Texas Uniform Trade Secrets Act.  (Doc. # 25).  The current status of that lawsuit is unknown.

13 at 7).  Jarvis did connect with Archer on LinkedIn.  (*Id.* at 16).  However, once Acuity Lighting filed this suit, Miller instructed her to cease contact with Archer.  (Doc. # 168-11 at 20-21).

As discovery proceeded in this action, Big Ass Fans continued to prepare for the launch of its High Bay LED.  (Doc. # 120-5 at 3-4).  Although a special sales group had handled lighting sales in the past, Big Ass Fans decided to reassign lighting to the general sales team, overseen by Bickley.  (*Id.*; Doc. # 168-5 at 22).  Accordingly, in December 2013, Bickley began attending meetings about lighting sales strategies.  (Doc. # 168-5 at 22-24).  Chief among Bickley's strategies was the Trial Installation Program, or "TIP," which offered existing customers a trial installation of the High Bay LED.  (*Id.*).  Bickley accompanied his team members on sales calls during this time and provided feedback about the TIP campaign to Smith.  (*Id.* at 24-29).  Bickley also sought Robinson's advice on some of these matters.  (*Id.* at 30-31).  Some of Acuity Lighting's agents, who had contracted with Big Ass Fans to sell fans, recall that Bickley and Robinson contacted them during this time and asked them if they were interested in selling the High Bay LED on commission.  (Docs. # 168-21 at 4 and 168-22 at 4-8).  Both agents declined these offers.  (*Id.*).  In February of 2014, Big Ass Fans finally began manufacturing its High Bay LED.  (Doc. # 120-5 at 3-4).

Meanwhile, Miller asked Bickley and Robinson to give him the flash drive and external hard drive that they had retained from Acuity Lighting.  (Doc. # 120-26 at 4).  Both men did as instructed, and Miller gave the items to defense counsel, who arranged for a forensic computer expert to examine both storage devices, as well as the computers that both men used at Big Ass Fans.  (*Id.*).  According to Miller, the examination revealed that

nothing on Robinson's external hard drive had been transferred to his work computer.  (*Id.*).

Bickley's work computer had only one Acuity Brands presentation, which he had allegedly

retrieved from the investor relations link on Acuity Brands' website.  (*Id.*).

Acuity Lighting also retained a forensic computer expert to examine the devices.[9]

(Doc. # 142-9).   Although Bickley and Robinson insist that they did not access any

documents pertaining to Acuity Lighting, let alone disclose them to Big Ass Fans, Plaintiffs

argue that the forensic examination results support the opposite conclusion.  (Docs. # 120-

15 and 120-16).  According to Sheffield, the forensic examination revealed that Bickley had

accessed a number of documents on the flash drive after leaving Acuity Lighting's

employment.  (Docs. # 168-3 at 23-24 and 168-16).  Acuity Lighting's Vice President of

Global Business Development, Anthony Gineris, testified that some of the documents

contained proprietary information.  (Doc. # 122-8 at 5-10).  However, he did not know

whether these documents were among those allegedly accessed by Bickley.  (*Id.*).

Bickley continued to supervise the general sales force at Big Ass Fans until May of

2014, when he became the Lighting Sales Manager.  (Doc. # 120-15 at 3).   Lighting

accounted for less than 10% of the sales made by his team from February to May.  (*Id.*).

Most of these sales were made in the retrofit market, rather than the new construction

market.  (*Id.*).

More than fifteen months after the filing of this action, the parties completed their

discovery efforts.  (Doc. # 86).  Defendants Bickley, Robinson and Big Ass Fans then filed

---

9) Neither Plaintiffs nor Defendants have filed the actual results of these forensic examinations in the record.  The Court has only secondhand testimony and invoices at its disposal.  (Docs. # 120-26 at 4 and 142-9).

Motions for Summary Judgment, which are fully briefed and ripe for the Court's review. (Docs. # 120, 121, 168, 179 and 182).

## III.   Analysis

### A.   Standard of Review

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  If there is a dispute over facts that might affect the outcome of the case under governing law, then entry of summary judgment is precluded.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party has the ultimate burden of persuading the court that there are no disputed material facts and that he is entitled to judgment as a matter of law.  *Id.*  Once a party files a properly supported motion for summary judgment by either affirmatively negating an essential element of the non-moving party's claim or establishing an affirmative defense, "the adverse party must set forth specific facts showing that there is a genuine issue for trial."  *Id.* at 250.  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."  *Id.* at 252.

### B.   Contract-Based Claims

#### 1. Choice of Law

"It is a well-accepted principle that a federal court in a diversity case must apply the conflict of law rules of the state in which it sits."  *Banek Inc. v. Yogurt Ventures U.S.A., Inc.*, 6 F.3d 357, 361 (6th Cir. 1993) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 490 (1941)). However, courts "only need[ ] to go through the choice of law analysis when

a conflict occurs between two states' laws." *Asher v. Unarco Material Handling, Inc.*, 737 F. Supp. 2d 662, 667 (E.D. Ky. 2010).

At first blush, this case does not seem to require a choice of law analysis. After all, the Stock Award and Notification Agreement specifically states that "[t]he validity, interpretation, construction, and performance of this Agreement and Exhibit A shall be governed by the laws of the state of Georgia without giving effect to the conflicts of laws principles thereof." (Doc. # 120-2 at 7). Both parties have presumed that this provision is effective and that Georgia law applies to this litigation. (Docs. # 120-1, 121-1 and 168). However, the law does not necessarily lead to this result.

Plaintiffs filed this diversity action in the Eastern District of Kentucky, and so, the Court must apply Kentucky's conflict of law rules. Kentucky courts "are very egocentric [and] protective concerning choice of law questions." *Paine v. La Quinta Motor Inns, Inc.*, 736 S.W.2d 355, 357 (Ky. Ct. App. 1987), *overruled on other grounds by Oliver v. Schultz*, 885 S.W.2d 699 (Ky. 1994). "[I]t is apparent that Kentucky applies its own law unless there are overwhelming interests to the contrary." *Harris Corp. v. Comair, Inc.*, 712 F.2d 1069, 1071 (6th Cir. 1983). Moreover, Kentucky courts have given little weight to contractual choice of law provisions. *See Wells Fargo Fin. Leasing, Inc. v. Griffin*, 970 F. Supp. 2d 700, 709-10 (W.D. Ky. 2013). Thus, it is possible that Kentucky law could apply to this dispute instead of Georgia law.

Because Kentucky law is much more accepting of post-employment restrictive covenants than Georgia law, the Court believes that there is indeed a conflict necessitating this choice of law analysis. *Compare Hammons v. Big Sandy Claims Serv., Inc.*, 567

14

S.W.2d 313, 315 (Ky. Ct. App. 1978) (approving the use of the "blue pencil" rule[10] and observing that restrictive covenants are a valid business tool, enforceable so long as they are not unlimited as to both time and space or unlimited as to space but not time) *with* *Trujillo v. Great S. Equip. Sales, LLC*, 657 S.E.2d 581, 583 (Ct. App. Ga. 2008) (stating that the "blue pencil" rule does not apply to contracts involving post-employment restrictive covenants, which must be "strictly limited as to time, territorial effect, capacity in which the employee is prohibited from competing, and as to overall reasonableness").

Kentucky courts utilize different choice of law tests for contract cases and tort cases. *Saleba v. Schrand*, 300 S.W.3d 177, 181 (Ky. 2009). In contract cases, Kentucky courts apply the "most significant contacts" test, set forth in § 188 of the Restatement (Second) of Conflict of Laws.[11] *Id.* Specifically, § 188(1) provides that "[t]he rights and duties of the

---

10) The "blue pencil" doctrine is "[a] judicial standard for deciding whether to invalidate the whole contract or only the offending words." Black's Law Dictionary 183 (8th ed. 2004). "If this standard applies, then only the offending words are invalidated if it would be possible to delete them simply by running a blue pencil through them, as opposed to changing, adding or rearranging the words." *Curtis 1000, Inc. v. Martin*, 197 F. App'x 412, 420 n. 2 (6th Cir. 2006) (internal quotations omitted). Case law suggests that Kentucky may be particularly generous with its application of the blue pencil doctrine. *Kegel v. Tillotson*, 297 S.W.3d 908, 913 (Ky. Ct. App. 2009) (stating that the blue pencil rule "empower[s it] to reform or amend restrictions in a non-compete clause if the initial restrictions are overly broad or burdensome").This is very different from Georgia's approach, and underlines the importance of the choice of law analysis in this case.

11) Section 188 is explicitly titled "Law Governing in Absence of Effective Choice by the Parties." However, "[t]he Kentucky Supreme Court has applied this test even where the contract at issue contains a choice of law clause." *Papa Johns Int'l, Inc. v. Pizza Magia Int'l, LLC*, Civ. A. No. 3:00-CV-548-H, 2001 WL 1789379, at *2 (W.D. Ky. May 10, 2001) (citing *Breeding v. Mass. Indem. & Life Ins. Co.*, 633 S.W.2d 717, 717-18 (Ky. 1982)). The Sixth Circuit has cautioned the Kentucky Supreme Court against "precluding parties from making a reasonable and binding choice as to the law that will govern their contractual relationship." *Wallace Hardware Co., Inc. v. Abrams*, 223 F.3d 382, 391 (6th Cir. 2000). In *Wallace Hardware*, the Sixth Circuit "ultimately predicted that Kentucky would apply § 187 [Law of the State Chosen by the Parties] rather than § 188 when faced with a contractual choice of law provision" and reversed the district court's decision applying § 188. *Wells Fargo Fin. Leasing, Inc. v. Griffin*, 970 F. Supp. 2d 700, 709 (W.D. Ky. 2013) (discussing the implications of *Wallace Hardware*). However, "[r]ecent decisions by Kentucky's highest court have shown this prediction to be mistaken, and, in stead, have affirmed the application of § 188's most-

parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6." Courts should consider the following factors in determining which state has the most significant relationship to the transaction: (1) the place of contracting; (2) the place of negotiation of the contract; (3) the location of the subject matter of the contract; (4) the place of performance; and (5) the domicile, residence, nationality, place of incorporation and business of the parties. *See* Restatement (Second) of Conflict of Laws, § 188(2)(a)-(e).

"[T]he place of contracting is the place where occurred the last act necessary, under the forum's rules of offer and acceptance, to give the contract binding effect." Restatement (Second) of Conflict of Laws § 188, cmt. e. In this case, the contract at issue is the Stock Notification and Award Agreement, and the last act necessary to give it binding effect would be execution by Bickley and Robinson. Both men electronically executed the Agreement using Acuity's acceptance software, but there is no record of where this actually occurred. Accordingly, the Court will presume that each man executed the Agreement in the state where they lived and worked. At that time, Bickley resided in Georgia and Robinson lived in Kentucky, so this factor supports the application of either state's law.[12]   The state where

---

significant-relationship test, even where the parties have expressly agreed to have their contractual rights and duties governed by a particular state's laws." *Id.* (citing *Schrand*, 300 S.W.3d at 181; *Schnuerle v. Insight Commc'n Co.*, 376 S.W.3d 561, 566-67 (Ky. 2012)). For these reasons, the Court will apply § 188's most significant relationship test, regardless of the Agreement's choice of law provision.

12) Although both Bickley and Robinson traveled frequently while employed at Acuity Lighting, there is no evidence in the record to suggest that they executed the Agreement while traveling. (Docs. # 120-15 and 120-16). Even if that proved to be the case, "[s]tanding alone, the place of contracting is a relatively insignificant contact." Restatement (Second) of Conflict of Laws § 188, cmt. e.

the parties negotiate and agree on the terms of their contract "has an obvious interest in the conduct of the negotiations and in the agreement reached." *Id.* However, these contacts are "of less importance when there is no one single place of negotiation and agreement, as, for example, when the parties do not meet but rather conduct their negotiation from separate states by mail or telephone." *Id.* The record suggests that there was not much negotiation involved in the formation of the Agreement. Acuity Brands awarded shares of stock to Acuity Lighting employees so that they would be further invested in the company's success. (Doc. # 120-2). According to Bickley and Robinson, employees routinely accepted such awards, without asking any questions, by a certain date. (Docs. # 168-2 at 35 and 168-7 at 15-19). Robinson testified that he felt that he would be "rais[ing] a red flag" if he did not sign the Agreement because "nobody's never not signed one of these." (*Id.*). For these reasons, Bickley and Robinson consented to the terms of the Agreement via electronic software, which leads the Court once again to Georgia and Kentucky law. (Docs. # 120-2 and 120-3).

Typically, "[t]he state where performance is to occur under a contract has an obvious interest in the nature of the performance and in the party who is to perform." *Id.* However, this factor bears relatively little weight when the place of performance is either uncertain or unknown at the time of contracting. *Id.* Such is the case here. Bickley and Robinson actually promised to refrain from competing with Acuity Lighting, soliciting its employees, and disclosing its trade secrets when they left its employ. (Docs. # 120-2 and 120-3). Thus, Bickley and Robinson were expected to perform wherever they next worked. Although that place turned out to be Kentucky, it could just as easily have been another state. At the time that Bickley and Robinson executed their Agreements, neither they nor

17

Acuity Lighting had any idea where or when performance would occur.[13]  Thus, this factor leans only slightly in favor of applying Kentucky law.

The situs question is significant "[w]hen the contract deals with a specific physical thing, such as land or a chattel, or affords protection against a localized risk, such as the dishonesty of an employee in a fixed place of employment."  *Id.*  This case does not present either of those situations.  The Agreement does not pertain to land or chattel, nor does it afford protection against a localized risk.  Rather, it seeks to protect Acuity Lighting against competition or solicitation by its former employees–risks that could arise in any number of locations, unknown at the time of contracting.  Accordingly, the Court will treat this factor as neutral.

Finally, the significance of residence or domicile "depends largely upon the issue involved and upon the extent to which they are grouped with other contacts."  *Id.*  For example, "[t]he fact that one of the parties is domiciled or does business in a particular state assumes greater importance when combined with other contacts, such as that this state is the place of contracting or of performance or the place where the other party to the contract is domiciled or does business."  *Id.*  Here, Bickley resided in Georgia and Robinson lived in Kentucky when they executed the Agreement.  (Docs. # 120-15 and 120-16).  Both men now reside in Kentucky.  (*Id.*).  Acuity Lighting had, and continues to have, its principal

---

13) The record reflects that the headhunting agency first contacted Bickley in November of 2012. (Doc. # 120-15 at 1).  He executed the Agreement on December 1, 2012.  (Doc. # 120-2 at 3). Although Bickley may have been interested in the Big Ass Fans opportunity at that point, he could not have known with any certainty that Kentucky would be the place of performance for these post-employment restrictive covenants.

place of business in Georgia.[14]   (Doc. # 67 at 1).   This factor also points toward the application of either Kentucky or Georgia law.

After considering these five factors, the Court still lacks a clear answer to the choice of law question.   The first, second and fifth factors support the application of either Kentucky or Georgia law.   Although these factors slightly favor the application of Georgia law, due to the fact that Bickley lived and worked there at the time of contracting, the third factor slightly weighs in favor of Kentucky law.   The fourth factor is not implicated.   Thus, in deciding between Georgia and Kentucky law, the Court must carefully consider which one best serves the principles that underlie § 188.

These principles, enumerated in the Restatement (Second) of Conflict of Laws § 6(2), include: (a) the needs of the interstate and international systems; (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (d) the protection of justified expectations; (e) the basic policies underlying the particular field of law; (f) certainty, predictability and uniformity of result; and (g) ease in the determination and application of the law to be applied.   *Wells Fargo*, 970 F. Supp.2d at 710.   "When using this framework, [courts] 'must balance principles, policies, factors, weights, and emphases to reach a result, the derivation of which, in all honesty, does not proceed with mathematical precision."   *Id.* (quoting *Int'l Ins. Co. v. Stonewall Ins. Co.*, 86 F.3d 601, 606 (6th Cir. 1996)).

---

14) Acuity Brands is incorporated under the laws of Delaware.   (Doc. # 67 at 1).   However, "a corporation's principal place of business is a more important contact than the place of incorporation, and this is particularly true in situations where the corporation does little, or no, business in the latter state."   Restatement (Second) of Conflict of Laws § 188, cmt. e.   Such is the case here.

As the Restatement itself observes, any solution will likely require some give-and-take between states. § 6, cmt. d. "In formulating rules of choice of law, a state should have regard for the needs and policies of other states and of the community of states." *Id.* Even Kentucky law, with its egocentric twist on choice of law rules, acknowledges that there are situations in which its laws should not be applied. *Harris*, 712 F.2d at 1071.

The Court believes that this is such a situation. While Kentucky certainly has a general interest in protecting its citizens against suit, Georgia's interests are more specific. This case centers upon the enforceability of several restrictive covenants. Unlike Kentucky, Georgia has formulated very stringent policies about this area of the law, and it certainly has an interest in seeing those policies applied to an Agreement that had significant ties to the state at the time of execution.

This result also protects justified expectations and promotes uniformity. In this case, the parties expected that Georgia law would apply to this dispute because the Agreement contains a choice of law provision. Although Kentucky law does not give effect to such provisions, many states do. It is easy to imagine a scenario in which a group of Acuity Lighting employees execute the same Stock Notification Award and Agreement, then seek employment elsewhere. While some of these employees may be bound by the restrictive covenants contained in the Agreement, others may not be, simply because their new state has more favorable choice of law rules. This result would not only be confusing, it would be unjust. Accordingly, the Court will apply Georgia law to the instant dispute.

### 2.    Applicability of the Restrictive Covenants

"[T]he construction of a contract is a question of law for the court." *Bd. of Comm'rs of Crisp Cnty. v. City Comm'rs of City of Cordele*, 727 S.E.2d 524, 526-27 (Ga. Ct. App.

2012).  The first step in construing a contract is "to decide whether the language of the contract is clear and unambiguous."  *Id.* at 527.  "If so, the contract is enforced according to its plain terms, and the contract alone is looked to for meaning."  *Id.*

Defendants argue that the restrictive covenants at issue do not apply to the activities of Bickley, Robinson and Dantzler.  (Doc. # 120-1 at 15).  These covenants discuss the departing employee's interactions with "the Company," but do not define that term.  (Doc. # 120-2 at 8-15).  However, the Agreement itself defines "the Company" as Acuity Brands, Inc.  (*Id.* at 4).  Thus, Defendants conclude that these covenants only prohibit Bickley and Robinson from soliciting employees of Acuity Brands, Inc. and competing with that entity.  Because Plaintiffs allege, *inter alia*, that Bickley and Robinson solicited Acuity Lighting employees  and competed with Acuity Lighting, Defendants conclude that the restrictive covenants are not implicated in this litigation.

Although the Agreement initially defines "the Company" as Acuity Brands, Inc., the Terms and Conditions section further states:

(a)    Restrictions
          . . . .

    (ii)    Except for death, Disability or Change in Control, as set forth below, if the Grantee remains employed by the Company, the Restricted Stock shall vest pursuant to the schedule set forth above.  *For purposes of this Agreement, employment with a subsidiary of the Company shall be considered employment with the Company.*

(Doc. # 120-2 at 5) (emphasis added).  Acuity Lighting is a subsidiary of Acuity Brands, Inc. (Doc. # 10).  This language clearly indicates that the restrictive covenants are also supposed to protect Acuity Brands's subsidiary, Acuity Lighting.  Therefore, the Court must enforce the contract according to its plain terms and find that the restrictive covenants

21

apply to the alleged conduct of Bickley, Robinson and Dantzler vis a vis Acuity Lighting.[15]

### 3.     Enforceability of the Restrictive Covenants

Georgia law recognizes four basic types of restrictive covenants: non-competition, non-solicitation of customers, non-recruitment of employees and non-disclosure of confidential information. *Albany Bone & Joint Clinic, P.C. v. Hajek*, 612 S.E.2d 509, 512 (Ct. App. Ga. 2005).  "A characteristic shared by each of these provisions is a prohibition, or at the very least a limitation, placed by one party on the other party's *future* business activities."  *Id.* (emphasis in original).

Georgia law subjects restrictive covenants "to three levels of judicial scrutiny: 'strict scrutiny, which applies to employment contracts; middle or lesser scrutiny, which applies to professional partnership agreements; and much less scrutiny, which applies to sale of business agreements.'" *Am. Control Sys., Inc. v. Boyce*, 694 S.E.2d 141, 144 (Ct. App. Ga. 2010).  "Restrictive covenants that are ancillary to an employment contract are subject to strict scrutiny and will be voided by Georgia courts if they impose an unreasonable restraint on trade."  *Trujillo*, 657 S.E.2d at 583-84; *see also Albany Bone & Joint Clinic*, 612 S.E.2d at 512 (explaining that such restrictive covenants "exist to protect the employer's interest in property, confidential information, customer goodwill, business relationships, and other economic advantages the employer has earned for the business over the years").

---

15) Even if this language is ambiguous, and the Court does not believe that it is, Defendants' proposed interpretation of the Agreement would lead to a nonsensical result.  The restrictive covenants are clearly intended to protect the lighting business.  Acuity Brands does not manufacture lights; it merely serves as the parent company for Acuity Lighting.  Thus, if the restrictive covenants were limited to Acuity Brands, they would completely fail to achieve their intended purpose.

22

Applying strict scrutiny, a restrictive covenant in an employment contract will be considered overbroad unless: "(1) the restraint is reasonable; (2) founded upon valuable consideration; (3) is reasonably necessary to protect the party in whose favor it is imposed; and (4) does not unduly prejudice the interests of public." *Dent Wizard Intl. Corp. v. Brown*, 612 S.E.2d 873, 876 (Ct. App. Ga. 2005). "Whether the restraint imposed by the employment contract is reasonable is a question of law for determination by the court, which considers the nature and extent of the trade or business, the situation of the parties, and all other circumstances." *Id.* If a provision is found to be overbroad, Georgia courts will not enforce it. *Id.*

"[I]n restrictive covenant cases strictly scrutinized as employment contracts, Georgia does not employ the 'blue pencil' doctrine of severability." *Advance Tech. Consultants, Inc. v. Roadtrac, LLC*, 551 S.E.2d 735, 737 (Ct. App. Ga. 2001). This doctrine permits courts to "cross[ ] out, as with a blue pencil, those provisions which render a covenant overbroad[,]" and therefore, unenforceable. Ga. Employment Law § 2:11 (4th ed.). Absent such a rule, Georgia courts have repeatedly held that if one covenant in an agreement is unenforceable, then all are. *See, e.g., Advance Tech. Consultants*, 551 S.E.2d at 737.

### a. Breach of Contract (Non-Disclosure of Trade Secrets and Confidential Information Clause) Claim Against Bickley and Robinson

"The validity of a non-disclosure provision depends upon its reasonableness," which depends upon two factors: "(1) whether the employer is attempting to protect confidential information relating to the business, such as trade secrets, methods of operation, names of customers, personnel data, and so on; and (2) whether the restraint is reasonably related to the protection of the information." *Holland Ins. Grp., LLC v. Senior Life Ins. Co.*, 766

23

S.E.2d 187, 192 (Ct. App. Ga. 2014) (internal citations omitted).  "A non-disclosure clause with no time limit is unenforceable as to information that is not a trade secret."  *Id.* (internal citations omitted); *see also Carson v. Obor Holding Co., LLC*, 734 S.E.2d 477, 481 (Ct. App. Ga. 2012) ("The fact that this clause purports to bind Carson 'in perpetuity,' together with its failure to define 'confidential information,' renders it overly broad and therefore unenforceable under Georgia law."); *Pregler v. C&Z, Inc.*, 575 S.E.2d 915, 917 (striking down a non-disclosure clause that prohibited an employee from disclosing any "Proprietary Information" for an unlimited period of time).

In this case, the Trade Secrets and Confidential Information clause provides as follows:

> Grantee agrees that he/she shall protect the Protected Parties' Trade Secrets (as defined in Section 1(b) above) and Confidential Information (as defined in Section 1(a) above) and shall not disclose to any person or entity, or otherwise use or disseminate, except in connection with the performance of his/her duties for the Company, any Trade Secrets or Confidential Information; provided, however, that Grantee may make disclosures required by a valid order or subpoena issued by a court or administrative agency of competent jurisdiction, in which event Grantee will promptly notify the Protected Parties of such order or subpoena to provide the Protected Parties an opportunity to protect their interests.  *Grantee's obligations under this Section 2(b) have applied throughout his/her active employment, shall continue after the Date of Termination, and shall survive any expiration or termination of this Agreement, so long as the information or material remains Confidential Information or a Trade Secret, as applicable.*

(Doc. # 120-2 at 12) (emphasis added).

According to Section 1(b), "Trade Secrets" has the meaning set forth under Georgia Law, O.C.G.A. §§ 10-1-760, *et seq.*"  (*Id.* at 9).  The term "Confidential Information" includes:

data and information relating to the Company's Business;[16] disclosed to Grantee or of which Grantee became aware as a consequence of Grantee's relationship with the Company; having value to the Company; not generally known to the competitors of the Company; and which includes trade secrets, methods of operation, names of customers, price lists, financial information and projections, route books, personnel data, and similar information. For purposes of this Agreement, subject to the foregoing and according to terminology commonly used by the Company, the Company's Confidential Information shall include, but not be limited to, information pertaining to: (1) Business Opportunities (as defined below); (2) data and compilations of data relating to the Company's Business (as defined in Exhibit A); (3) compilations of information about ,and communications and agreements with, customers and potential customers of the Company; (4) computer software, hardware, network and internet technology utilized, modified or enhanced by the Company or by Grantee in furtherance of Grantee's duties with the Company; (5) compilations of data concerning Company products, services, customers, and end users including but not limited to compilations concerning projected sales, new project timelines, inventory reports, sales, and cost and expense reports; (6) compilations of information about the Company's employees and independent contracting consultants; (7) the Company's financial information, including, without limitation, amounts charged to customers and amounts charged to the Company by its vendors, suppliers, and service providers; (8) proposals submitted to the Company's customers, potential customers, wholesalers, distributors, vendors, suppliers and service providers; (9) the Company's marketing strategies and compilations of marketing data; (10) compilations of data or information concerning, and communications and agreements with, vendors, suppliers

---

16) The "Company's Business is defined as "the design, manufacture and/or sale of one or more of the following and any related products and/or services: lighting fixtures and systems, lighting control components and systems (including but not limited to dimmers, switches, relays, programmable lighting controllers, sensors, timers, and range extenders for lighting and energy management and other purposes), building management and/or control systems, emergency lighting fixture and systems (including but not limited to exit signs, emergency light units, inverters, back-up power battery packs, and combinations thereof), batter powered and/or photovoltaic lighting fixtures, electric lighting track units, hardware for mounting and hanging electrical lighting fixtures, aluminum, steel and fiberglass fixture poles for electric lighting, light fixture lenses, sound and electromagnetic wave receivers and transmitters, flexible and modular wiring systems and components (namely, flexible branch circuits, attachment plugs, receptacles, connectors and fittings), light emitting diode (LED) lamps, daylighting systems including but not limited to prismatic skylighting and related controls, organic LED products and technology, medical and patient care lighting devices and systems, and any wired or wireless communications and monitoring hardware or software related to any of the above.  This shall not include any product or service of the Company if the Company is no longer in the business of providing such product or service to its customers at the relevant time of enforcement." (*Id.* at 9-10).

and licensors to the Company and other sources of technology, products, services or components used in the Company's Business; (11) any information concerning services requested and services performed on behalf of customers of the Company, including planned products or services; and (12) the Company's research and development records and data. Confidential Information also includes any summary, extract or analysis of such information together with information that has been received or disclosed to the Company by any third party as to which the Company has an obligation to treat as confidential.

(*Id.* at 8-9).

However, the Agreement states that the term "Confidential Information" does not include:

> (A)    Information generally available to the public other than as a result of improper disclosure by Grantee;

> (B)    Information that becomes available to Grantee from a source other than the Company (provided Grantee has no knowledge that such information was obtained from a source in breach of a duty to the Company);

> (C)    Information disclosed pursuant to law, regulations or pursuant to a subpoena, court order or legal process; and/or

> (D)    Information obtained in filings with the Securities and Exchange Commission.

(*Id.*).

This clause does define "Trade Secrets" and "Confidential Information" separately. However, it prohibits an employee from disclosing either type of data for an unlimited period of time. As the case law states, employers are not required to put a time limit on non-disclosure of trade secrets, but they must place a time limitation on all other information that is not a trade secret. Plaintiffs failed to do that here, rendering the non-disclosure provision overly broad, and therefore, unenforceable. Because this breach of contract

26

claim cannot survive in the absence of an enforceable non-disclosure provision, Defendants are entitled to summary judgment.

### b. Breach of Contract (Non-Competition Clause) Claim Against Bickley

Non-competition clauses "must be strictly limited as to time, territorial effect, capacity in which the employee is prohibited from competing, and as to overall reasonableness." *Dent Wizard*, 612 S.E.2d at 876 (internal quotations omitted). In scrutinizing the territorial effect limitations, Georgia courts have "'accept[ed] as prima facie valid a territory where the employee worked and the employer does business.'" *Id.* (quoting *Hulcher Servs. v. R.J. Corman R.R. Co.*, 543 S.E.2d 461, 466 (Ga. Ct. App. 2000). However, "a territory that is only where the employer does business but the employee did not work is overly broad on its face, absent strong justification for such protection, other than the desire not to compete with the former employee." *Hulcher*, 543 S.E.2d at 466 (invalidating a non-compete clause that restricted a former employee from working in several states, even though he worked for his former employer "only in a limited area of such states where the railroads were located"); *Dent Wizard*, 612 S.E.2d at 876 (striking down a non-compete clause that contained a four-county territorial restriction, when the former employee did not work in all of those counties).

The Non-Competition clause at issue in this case provides as follows:

> In the event that Grantee,
>
> (i)    voluntarily resigns from the Company;
>
> (ii)   is Terminated for Cause (as defined above), or
>
> (iii)  declines to sign a Confidential Severance Agreement and Release offered by the Company in the event of a termination

27

> for any reason other than a Termination for Cause (including, for example, as a result of a position elimination)

Grantee acknowledges and agrees that during his/her employment, and for twelve (12) months after the Date of Termination, he/she has not and will not, directly or indirectly, engage in, provide, or perform any Employee Services[17] on behalf of any person or entity (or, if organized into divisions or units, any distinct division or operating unit) *in the Territory that derives revenue from providing goods or services substantially similar to those which comprise the Company's Business.* Notwithstanding the foregoing, if the Company terminates Grantee's employment for any reason other than a Termination for Cause (including, for example, as a result of a position elimination), and Grantee elects to sign a Confidential Severance Agreement and Release offered by the Company, the period covered by this non-competition covenant will be reduced to either, (i) the time within which severance payments are scheduled to be paid to Grantee under such agreement, or (ii) if severance is paid to Grantee in a lump sum, the number of weeks of Grantee's then-current regular salary are used to calculate such lump sum payment; provided, however, that the restrictive period calculated hereunder may not, in any event, exceed twelve (12) months following the Date of Termination.

(*Id.* at 12-13).

The "Territory" is generally defined as the United States. (*Id.* at 10). The only justification for applying the non-compete provision to such a broad area is found within the Agreement itself:

> Grantee acknowledges that the Company is licensed to do business and in fact does business in all fifty states in the United States. Grantee further acknowledges that the services she/he has performed on behalf of the Company are at a senior level and are not limited in their territorial scope to any particular city, state, or region, but instead affect the Company's activity within the entire United States. Specifically, Grantee provides Employee Services on the Company's behalf throughout the United States, meets with Company agents and distributors, develops products and/or contacts throughout the country, and otherwise engages in his/her work on behalf of the Company at a national level. Accordingly, Grantee agrees that these

---

17) "Employee Services" refers to "the duties and services of the type conducted, authorized, offered, or provided by the Grantee in his/her capacity as an employee on behalf of the Company within twelve (12) months prior to the Date of Termination." (*Id.* at 10).

restrictions are reasonable and necessary to protect the Confidential Information, trade secrets, business relationships, and goodwill of the Company.

(*Id.*).

It is true that Acuity Lighting does business throughout the United States. However, Bickley and Robinson were each responsible for sales in a particular region, so it stands to reason that they provided most of their services in their respective regions and made most of their contacts there. The record does not indicate that Bickley or Robinson had anything more than occasional interaction with other regions. This fact, standing alone, does not automatically justify the imposition of a nationwide non-compete to protect Acuity Lighting's trade secrets, business relationships and goodwill. When scrutinized carefully, this broad statement expresses little more than Acuity Lighting's desire to avoid competition by their former employees in the Territory, which is an insufficient justification under Georgia law. *See Hulcher*, 543 S.E.2d at 466.

Moreover, this clause totally fails to strike the necessary balance between "the employee's right to earn a living and ability to determine with certainty the geographic area boundaries in which post-employment activities are restricted" against "the employer's interest in customer relationships that its former employee established for the employer and its right to protect itself from the risk that the former employee might use such relationships to unfairly appropriate the employers's existing customers." *Id.* Because the non-compete clause is overbroad and unenforceable, Defendants are entitled to summary judgment on this breach of contract claim as well.[18]

---

18) In addition to damages, Plaintiffs seek injunctive relief against Bickley. (Doc. # 67). Specifically, they hope to enjoin him from competing with Acuity Lighting in his new role at Big Ass

        **c.**     **Breach of Contract (Non-Solicitation of Customers, Employees and Agents Clause) Claim Against Bickley and Robinson**

As the Court explained above, Georgia law does not apply the "blue pencil" doctrine in restrictive covenant cases subject to strict scrutiny. *Advance Tech. Consultants*, 551 S.E.2d at 737. Thus, although there is nothing patently overbroad about the clauses relating to the non-solicitation of customers, employees and agents, the Court cannot enforce them because they are part of the same Agreement as the unenforceable non-disclosure and non-competition provisions. Stated simply, "Georgia law is clear that if one of them is unenforceable, then they are all unenforceable." *Id.* Defendants are therefore entitled to summary judgment on these breach of contract claims.[19]

### 3.    Breach of Contract (Return of Property Clause)

"The elements for a breach of contract claim in Georgia are the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken. *Dewrell Sacks, LLP v. Chicago Title Ins. Co.*, 749 S.E.2d 802, 806 (Ct. App. Ga. 2013).

The Return of Property Clause states:

On or before Date of Termination, Grantee agrees to deliver promptly to the Company all files, customer lists, management reports, memoranda,

---

Fans. (*Id.*). Because the non-compete is overbroad and unenforceable, they are not entitled to such relief.

19) Plaintiffs argue that Bickley and Robinson were also bound to observe these restrictive covenants because they were embedded in the Confidentiality, Inventions and Non-Solicitation Agreement, which was provided in connection with annual ethics training. (Doc. # 168-8 at 21-26). Although this Agreement includes similar restrictive covenants, several of the substantive provisions differ. (*Id.*). Because of these differences, and because Plaintiffs' case centers on the Stock Notification and Award Agreement, the Court will not separately analyze the restrictive covenants embedded in the Confidentiality, Inventions and Non-Solicitation Agreement.

research, Company forms, financial data and reports and other documents (including all such data and documents in electronic form) of the Protected Parties, supplied to or created by him/her in connection with his/her employment hereunder (including all copies of the foregoing) in his/her possession or control, and all of the Company's equipment and other materials in his/her possession or control.  Grantee's obligations under this Section 2(c) shall survive any expiration or termination of this Agreement.

(Doc. # 120-2 at 12).[20]

Bickley and Robinson admit that they retained a flash drive and an external hard drive, respectively, with Acuity Lighting data on it.  (Docs. # 120-15 and 120-16).  In light of this testimony, Defendants concede that "there may be a genuine issue of material fact as to whether the inadvertent actions of [Bickley and Robinson] breached those provisions." (Doc. # 120-1 at 32).  Nevertheless, Defendants argue that they are entitled to summary judgment on this claim because Plaintiffs have no proof of damages resulting from the alleged breach.  (*Id.*).  In support of this proposition, Defendants point to Bickley and Robinson's testimony that they never accessed or disclosed the data after leaving Acuity Lighting's employment.  (Docs. # 120-15 and 120-16).

According to Plaintiffs, their forensic computer expert found that Bickley and Robinson accessed many of the documents on the flash drive and/or external hard drive. ((Docs. # 168-3 at 23-24 and 168-16).  Although it is unclear from the record whether Bickley and Robinson accessed documents containing confidential information, many of the documents on those devices did contain confidential information.  (Doc. # 170-6). Given the timing between the alleged access of these documents and the launch of the Big Ass

---

20)  In their briefing, Defendants lumped this provision in with the restrictive covenants discussed above.  However, it is not truly a restrictive covenant because it does not prohibit the employee from conducting certain post-employment activities.  For this reason, the Court will examine it separately.

High Bay LED, and drawing all inferences in favor of Plaintiffs, one could conclude that there is a causal connection between the alleged breach and Plaintiffs' flagging sales.

Even so, Defendants insist that there is insufficient proof of damages relating to this claim.   In support of this proposition, Defendants point out that Plaintiffs initially sought damages for: (1) any and all dilution and/or devaluation of the lighting market (and the corresponding dilution and/or devaluation of Acuity's share of that market) caused by [Big Ass Fans's] attempted entrance into the market using proprietary Acuity data to undercut Acuity prices; (2) any and all lost profits resulting from [Big Ass Fans's] use of proprietary Acuity data to sell any of its lighting products; and (3) any and all cost savings accrued by [Big Ass Fans] as a result of the misappropriation and use of Plaintiffs' data.  (Doc. # ). However, Defendants claim that Plaintiffs "have not purported to produce any documentation of a devaluation in its market share, any cost savings by [Big Ass Fans], or any loss of profits resulting from use of Acuity's proprietary data by [Big Ass Fans]."  (Doc. # 120-1 at 36).

Defendants have raised this issue once before, in briefing their Motion to Exclude (Doc. # 107).  However, Judge Wier declined to exclude these particular items of damages due to insufficient briefing on the issues.  Because the briefing is similarly inadequate in Defendants' Motions for Summary Judgment, the Court finds that summary judgment is inappropriate at this juncture.

### B.    Tort-Based Claims

#### 1.    Choice of Law

As the Court explained above, a choice of law analysis is only necessary when there is a conflict between two states' laws.  *Asher*, 737 F. Supp. 2d at 667.  Although the

elements of the two torts at issue here–tortious interference with contractual relations and tortious interference with business relations–are stated in different terms, they are substantively the same under Kentucky and Georgia law.  *Compare Snow Pallet, Inc. v. Monticello Banking Co.*, 367 S.W.3d 1, 5-6 (Ky. Ct. App. 2012) *with Kirkland v. Tamplin*, 645 S.E.2d 653, 655-56 (Ct. App. Ga. 2007).  Absent such a conflict, Kentucky law applies.[21]  *See Asher*, 737 F. Supp. 2d at 668, n. 1 ("[T]he Sixth Circuit has been clear that if no conflict exists and a state has a presumption for applying its own law, its own law will apply.  Kentucky indeed has such a presumption for applying its own law[.]").  Accordingly, the Court will apply Kentucky law to Plaintiffs' claims for tortious interference with contractual relations and tortious interference with business relations.[22]

### 2.    Tortious Interference with Contractual Relations Claim Against Big Ass Fans

Tortious interference with a contract requires proof of the following elements: (1) the existence of a contract; (2) knowledge of the contract; (3) that defendant intended to cause a breach of the contract; (4) that the defendant's actions did indeed cause a breach; (5) that damages resulted to plaintiff; and (6) that the defendant had no privilege or justification to excuse its conduct."  *Snow Pallet, Inc.*, 367 S.W.3d at 5-6.

---

21)  If there was such a conflict, Kentucky law would still likely apply to these tort claims.  As the Court has already explained, a federal court sitting in diversity applies the choice of law rules of the forum state.  *Banek*, 6 F.3d at 361.  In tort cases, Kentucky applies the "significant contacts" test. *Foster v. Leggett*, 484 S.W.2d 827, 829 (Ky. 1972). This test requires courts to apply Kentucky law "if there are significant contacts – not necessarily the most significant contacts – with Kentucky." *Id.* (also noting Kentucky's "egocentric" approach to choice of law questions).  This case certainly has significant contacts with Kentucky.  Both Bickley and Robinson live in Kentucky, and Big Ass Fans is a Kentucky-based corporation.  (Doc. # 67).  Moreover, at least some of the tortious conduct allegedly occurred in Kentucky.  (*Id.*).

22) The parties appear to have reached the same conclusion, as they too relied on Kentucky law in briefing their tortious interference claims.

Plaintiffs allege that Big Ass Fans tortiously interfered with the restrictive covenants incorporated in the Agreement. However, the Court has already found that these restrictive covenants are overly broad and unenforceable. That being the case, Plaintiffs cannot sustain their claim for tortious interference with contractual relations. *See Smith v. Caterpillar, Inc.*, Civ. A. No. , 2007 WL 98892, at *4 (E.D. Ky. Jan. 8, 2007) (citing *CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068, 1079 (W.D. Ky. 1995)) (explaining that a plaintiff must prove the existence of a valid contract in order to recover for tortious interference). Defendants are therefore entitled to summary judgment on this claim.

### 3. Tortious Interference with Business Relations Claim Against Bickley and Robinson

Tortious interference with a prospective business advantage does not require the existence of a contract. *Snow Pallet*, 367 S.W.3d at 5. Rather, it requires proof of the following elements: (1) the existence of a valid business relationship or expectancy; (2) that defendant was aware of this relationship or expectancy; (3) that defendant intentionally interfered; (4) that the motive behind the interference was improper; (4) causation; and (6) special damages. *Id.* at 5-6.

"Special damages" are essentially "pecuniary damages." *CMI, Inc.*, 918 F. Supp. at 1081. This element requires the plaintiff to "prove that it actually suffered damages as a result of [the defendant's] actions." *Ventas, Inc. v. Health Care Prop. Investors, Inc.*, 635 F. Supp. 2d 612, 624 (W.D. Ky. 2009) (internal quotations omitted). If the plaintiff fails to produce evidence of special damages, summary judgment is appropriate on the claim for tortious interference with business relations. *Id.*; *see also Canning v. Poole*, Civ. A. No. 10-16-JBC, 2012 WL 5198453, at *4 (E.D. Ky. Oct. 18, 2012).

34

According to Plaintiffs' Third Amended Complaint, the damages suffered include "the substantial cost required to identify, recruit, and train replacements for Robinson and Dantzler." (Doc. # 67 at 29). However, evidence of those damages has been excluded due to Plaintiffs' failure to comply with applicable discovery rules.[23] (Doc. # 200). Because Plaintiffs will not be able to introduce evidence of its damages, they will not be able to prove special damages, which is one of the elements of their claim. Therefore, Defendants are entitled to summary judgment on this claim.

### C.   Statutory Claims

#### 1.   Violations of the Kentucky Uniform Trade Secrets Act[24]

The Kentucky Uniform Trade Secrets Act provides in pertinent part:

(1)   Except to the extent that a material and prejudicial change of position prior to acquiring knowledge or reason to know of misappropriation renders a monetary recovery inequitable, a complainant shall be entitled to recover damages for misappropriation. Damages may include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss. In lieu of damages measured by other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret.

(2)   If willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award made under subsection (1).

---

23) Plaintiffs also claim to have suffered "substantial injury due to Defendants' unlawful solicitation, including the loss of its two employees and the corresponding investment of time, energy, and training [Acuity Lighting] put into them." (Doc. # 67 at 28). However, Plaintiffs have never attempted to quantify and support those damages, so the Court will focus solely on the damages that Plaintiffs did attempt to establish, albeit belatedly.

24) Plaintiffs pled this claim as a violation of the Kentucky Uniform Trade Secrets Act, presumably because most of the allegedly improper conduct occurred in Kentucky. (Doc. # 67 at 29-33). In any event, a choice of law analysis is not necessary as to this claim because Georgia has also adopted the Uniform Trade Secrets Act. *See* O.C.G.A. § 10-1-760, *et seq.*

Ky. Rev. Stat. Ann. § 365.884.

The Act defines "misappropriation" as:

(a)     Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret[25] was acquired by improper means;[26] or

(b)     Disclosure or use of a trade secret of another without express or implied consent by a person who:

     1.     Used improper means to acquire knowledge of the trade secret; or

     2.     At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:

          a.     Derived from or through a person who had utilized improper means to acquire it;

          b.     Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

          c.     Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

     3.     Before a material change in his position, knew or had reason to know that it was a trade secret and that knowledge of it had

---

25)  "'Trade secret' means information, including a formula, pattern, compilation, program, data, device, method, technique, or process, that:

    (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

    (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ky. Rev. Stat. Ann. § 365.880(4).

26)  "'Improper means' includes theft bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."  Ky. Rev. Stat. Ann. § 365.880(1).

been acquired by mistake or accident.[27]

Ky. Rev. Stat. Ann. 365.880(2).

This claim bears resemblance to Plaintiffs' claim for breach of the return of property provision, in that it focuses on whether Bickley and Robinson obtained and accessed sensitive information on their devices, then disclosed it to Big Ass Fans. As the Court has already observed, there is a genuine issue of material fact on each of those issues. Moreover, a reasonable juror could conclude, based on the timing between the alleged access of these documents and the launch of the Big Ass High Bay LED, that there is a causal connection between the alleged breach and Plaintiffs' damages. For these reasons, Defendants are not entitled to summary judgment on this claim.

## IV.   Conclusion

Accordingly, for the reasons stated herein,

**IT IS ORDERED** as follows:

(1)     Defendants Shane Bickley and Michael Robinson's Motion for Summary Judgment (Doc. # 120) is hereby **GRANTED** as to **Count I** (breach of the non-solicitation provision), **Count III** (breach of the non-disclosure provision), **Count IV** (breach of the non-competition provision) and **Count V** (tortious interference with business relations) and **DENIED** as to **Count II** (breach of the return of property provision) and **Count VI** (violation

---

27) A close examination of this statute raises two interesting questions. First, does the information allegedly accessed by Bickley and Robinson constitute a trade secret, as that term is defined in KUTSA? Second, in the absence of an enforceable non-disclosure clause, do Bickley and Robinson owe any such duty to Plaintiffs? Because these issues have not been sufficiently developed in the record, the Court will simply assume, without deciding, that some of the allegedly accessed information includes trade secrets and that Bickley and Robinson still owe a duty to Acuity Lighting. Even so, there is nonetheless a genuine issue of material fact as to whether Bickley and Robinson misappropriated those trade secrets in violation of KUTSA.

of the Kentucky Uniform Trade Secrets Act);

  (2) Defendant Delta T Corporation's Motion for Summary Judgment (Doc. # 121) is hereby **GRANTED** as to **Count VII** (tortious interference with contractual relations);

  (3) Delta T Corporation is hereby **DISMISSED** as a party to this action, as the Court has adjudicated the sole claim against it; and

  (4) The remaining parties to this action shall file a **Joint Notice** of available pretrial and trial dates **within twenty (20) days of the date of entry of this Order**.

  This 24th day of March, 2016.



Signed By:

***David L. Bunning***

**United States District Judge**

G:\DATA\Opinions\Lexington\13-366 MOO Granting MSJ in Part.wpd