**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**AT LEXINGTON**

**CIVIL ACTION NO. 13-366-DLB-REW**

**ACUITY BRANDS, INC., et al.**                                                    **PLAINTIFFS**

**vs.**                    **MEMORANDUM OPINION AND ORDER**

**SHANE BICKLEY, et al.**                                                          **DEFENDANTS**

* * * * * * * * * * * * * *

I.    **Introduction**

Plaintiff Acuity Brands Lighting, Inc., together with its parent company, Plaintiff Acuity Brands, Inc. (collectively "Acuity"), initiated this civil action against two of its former employees, Defendants Shane Bickley and Michael Robinson (collectively "Individual Defendants"), as well as their current employer, Defendant Delta T Corporation, doing business as Big Ass Fan Company ("Big Ass Fans").  In their Third Amended Complaint (Doc. # 67), Plaintiffs alleged that Bickley and Robinson breached several restrictive covenants contained in agreements they entered into during their employment,[1] tortiously interfered with business relations,[2] and violated the Kentucky Uniform Trade Secrets Act

_____

1    Count One alleged that Bickley and Robinson breached the non-solicitation covenant, Count Two alleged that Bickley and Robinson breached the return-of-property covenant, Count Three alleged that Bickley and Robinson breached their confidentiality and trade secrets covenant, and Count Four alleged that Bickley violated his non-competition covenant.

2    Count Five alleged that Bickley and Robinson tortiously interfered with business relations.

1

("KUTSA").[3]  Plaintiffs also claimed that Big Ass Fans tortiously interfered with contractual relations.[4]

This case is unwieldy to say the least.  There have been multiple Amended Complaints (Docs. # 19, 35, 67); countless Motions to Seal and Motions for Extension of Time; and a horde of procedural and substantive motions, including: a Motion to Expedite (Docs. # 3, 17); Motions to Dismiss (Docs. # 12, 21, 33)[5], a Motion to Quash (Docs. # 29, 30), Motions to Compel (Docs. # 47, 51, 87, 93), a Motion for Sanctions (Docs. # 95, 137, 155), a Rule 37 Motion to Exclude Evidence (Docs. # 107, 191, 201), Motions for Summary Judgment (Docs. # 120, 121, 202), and now, Motions for Reconsideration (Docs. # 206 and 209).  In light of this complex history, the Court will briefly summarize the facts and highlight only the most important and relevant prior procedural points.

## II.    Factual and Procedural Background

Acuity is a Georgia-based corporation that manufactures and sells a broad array of lighting products for use in a variety of indoor and outdoor settings.  (Doc. # 67 at 4).  Although Acuity does engage in some direct sales, it focuses on selling its products to

---

3    Count Six alleged that Bickley and Robinson committed violations of KUTSA.  (Doc. # 67).

4    Count Seven alleged tortious interference with contractual relations against Big Ass Fans.  (Doc. # 67).

5    The Court previously granted Defendants' Motion to Dismiss Count Two of Plaintiffs' Amended Complaint and Plaintiffs' demand for punitive damages.  (Doc. # 33).  Count Two was dismissed because the tortious interference claim against Bickley and Robinson was based entirely on contractual duties prohibiting the solicitation of Plaintiffs' employees.  *Id.* at 1.  Because failure to perform contractual obligations typically does not give rise to a tort claim, and Plaintiff did not allege any independent legal duty, Plaintiff failed to meet the threshold requirement for maintaining an action in tort.  *Id.* at 1-2.  Therefore, that claim was dismissed.  Similarly, Kentucky law does not permit recovery of punitive damages for mere breach of contract, and Plaintiffs' demand for punitive damages was also dismissed.  *Id.* at 2.  Plaintiffs amended their Complaint twice after this Order.  (Docs. # 35 and 67).

independent sales agents who represent other lighting companies.  (Docs. # 120-8, 120-15, 123-3 and 168-3 at 5-6).   These lighting companies sell Acuity's products to other middlemen distributors, rather than end-user customers.  (Docs. # 120-8 and 120-15). One of Acuity's most popular products, the I-Beam LED light, which is a high-bay LED light product ("the IBL product"), is the focal point of this litigation.

Acuity employs several Regional Sales Vice Presidents ("RVPs") who are responsible for cultivating relationships with these agents, recommending product pricing, and setting agency sales targets in their assigned regions.  (Doc. # 12).  Simply put, the RVPs drive the sale of Acuity's products.  (Docs. # 120-15 and 120-16).  Bickley served as the RVP for Acuity's South Central Region (which includes Texas, Oklahoma, Arkansas, Louisiana, Mississippi, and New Mexico) from April 2010 to March 2013.  (Docs. # 120-15, 168 at 2, and 168-5 at 43).   Robinson served as the RVP for Acuity's Midwest Region (composed of Kentucky, Ohio, Indiana, Michigan, Illinois, Wisconsin and the city of St. Louis, Missouri) from January 2011 to May 2013.  (Docs. # 120-16 and 168-2 at 29, 53).

During the course of their employment, and specifically in the Fall of 2012, both Bickley and Robinson were awarded shares of Acuity's stock.  (Docs. # 120-2 ;168-7 at 10; 120-3; and 168-2 at 33).  As consideration for these awards, employees must execute a Stock Notification and Award Agreement ("Stock Award Agreement") using Acuity's electronic acceptance software.  (Doc. # 120-2 at 5).  Both men electronically executed a copy of the Agreement, which contained several post-employment restrictive covenants pertaining to non-solicitation, non-competition, and confidentiality, among other things. (Docs. # 120-2 and 120-3).  The Agreement conditioned the stock award on acceptance of the terms of the Agreement, including those set forth in Exhibit A, entitled

3

"Confidentiality, Inventions, Non-Solicitation and Non-Competition Provisions."  (Doc. # 120-2 at 5-8).  The Agreement also included a return-of-property clause, which required departing employees to promptly return all company property to Acuity. *Id.*

In the early months of 2013, a national recruitment firm contacted Bickley about an employment opportunity at Big Ass Fans, a Kentucky-based company that manufactures and sells low-speed high-volume fans.  (Doc. # 120-15 at 1).  At that time, there was a business relationship between Acuity and Big Ass Fans.  Since 2012, Big Ass Fans had been purchasing lighting products, as a middleman distributor, to sell to end-user customers from an Acuity independent sales agent, as well as other sources.  (Docs. # 120-1 at 4-5; # 120-5 at 2-3).  In mid-2012, Big Ass Fans began negotiations with Acuity to supply their IBL product to Big Ass Fans, who would then sell that product as a Big Ass Fans light under a private labeling agreement.  (Doc. # 120-5 at 3).  By the end of 2012, Big Ass Fans had been approved as an Acuity national account customer. *Id.*  Accordingly, Big Ass Fans purchased numerous lights from Acuity for resale to end-user customers. *Id.* In fact, Acuity was Big Ass Fans' exclusive source for the IBL product. *Id.*

Bickley pursued the opportunity with Big Ass Fans and received an offer of employment.  (Doc. # 120-15 at 1).  He told Robinson, his friend and colleague, about the offer.  (Doc. # 168-2 at 15).  Robinson, a Kentucky native who was unhappy with his current role at Acuity, asked Bickley to recommend him for the position if he declined the offer. *Id.*  Bickley promised to do so, but ultimately accepted the offer. *Id.*

Around this time, Big Ass Fans' Director of Human Resources, Scott Nielsen, asked Bickley whether Acuity had imposed any post-employment restrictive covenants on him. (Docs. # 168-8 at 16 and 168-11 at 7).  Bickley admitted that he was subject to restrictive

4

covenants. *Id.* However, he told Nielsen that the covenants, as he understood them, simply precluded him from working with certain lighting companies. *Id.* He also stated that his wife, an attorney, had examined the covenants and did not believe that his employment with Big Ass Fans would run afoul of them. Nielsen did not actually review a copy of the Stock Award Agreement at that time. *Id.*

In March 2013, Bickley voluntarily terminated his employment with Acuity. (Doc. # 120-15 at 3-4). He returned the company cell phone and laptop to the Human Resources Department. *Id.* However, he failed to return a flash drive, which contained PowerPoint presentations for Acuity clients concerning "new products launched by" Acuity's "drill product division" and "internal notes" concerning Acuity's "relationship between" their agents, distributor, and a specific company's performance, which was not related to the IBL product. (Doc. # 222-6). According to Bickley, he did not purposefully retain the flash drive; he simply forgot to include it with the rest of the items returned. (Doc. # 120-15 at 3-4).

Bickley assumed the role of Vice President of Sales at Big Ass Fans and began supervising a 150-person inside sales force. (Doc. # 120-15 at 3). He did not have any profit and loss responsibility or pricing control. *Id.* Although Big Ass Fans was exploring opportunities in the lighting industry at that time,[6] Bickley was only responsible for the sale of fans. *Id.* However, a month into his employment, Big Ass Fans' CEO, Carey Smith,

---

6       The record indicates that Big Ass Fans "began exploring the potential for selling energy efficient lights to its end-user fan customers in 2011." (Doc. # 123-2 at 3). According to both Bickley and Big Ass Fans' in-house counsel, Joseph Miller, a special sales group worked on lighting sales until the launch of the Big Ass High Bay LED in early 2014. (*Id.*; Doc. # 120-15 at 3-4).

asked Bickley to go to a lighting trade show.  (Doc. # 168-5 at 15-16).  He was also invited to meetings with Business Development Manager Tom Greinke and Engineer Isaac Fedyniak, who were spearheading Big Ass Fans' efforts to enter the lighting industry.  (*Id.* at 12).

About a month later, Robinson contacted Bickley about employment opportunities at Big Ass Fans.  (Doc. # 168-2 at 16-20).  Bickley told Robinson to send him a copy of his resume and promised to forward it to the Human Resources Department.  *Id.*  In May 2013, after several interviews, which Robinson discussed with Bickley, Robinson received an offer of employment from Big Ass Fans.  *Id.* at 12, 17-18, 24, 68-70.  He accepted the offer and informed Acuity that he was voluntarily terminating his employment.  *Id.* at 39. Robinson had a significant amount of personal information stored on his Acuity laptop, so before returning it to the company, he saved the entire contents on an external hard drive. *Id.* at 45-46.  Robinson insists that he was not trying retain any sensitive information about Acuity.  *Id.*  One week later, Robinson started working at Big Ass Fans.  (Doc. # 120-16 at 1).  He was primarily responsible for building a bid-specification/new construction channel for the company.  *Id.*

Shortly thereafter, Acuity's Human Resources Manager, Chad Sheffield, reviewed the contents of the cell phone Robinson returned.  (Doc. # 168-3 at 10-11, 14-15).  He discovered the text messages sent to and from Bickley about the interview process and wondered whether these communications violated either Bickley's or Robinson's restrictive covenants.  *Id.* at 14-15.  Sheffield promptly contacted Acuity's in-house counsel, Frank Whitaker, about the issue.  (Doc. # 168-1 at 12).  Whitaker sent a "cease and desist" letter, complete with copies of the Stock Award Agreement, to Big Ass Fans' in-house counsel,

6

Joseph Miller.  (Docs. # 120-4 at 8 and 120-24).  When Miller received the letter, he reviewed the covenants and asked Bickley and Robinson about their communications. (Doc. # 168-10 at 5-9).  Both men told Miller that Robinson had reached out to Bickley about employment.  *Id.*  Miller instructed them both to refer any future employment inquiries to the Human Resources Department.  *Id.*  Miller then convened a conference call with Whitaker and stated that Bickley and Robinson had not violated their covenants.  (Doc. # 120-4 at 8-10).

Meanwhile, Sheffield also relayed his concerns to Acuity's Senior Vice President of Sales and Marketing, Geoffrey Marlow, who had already heard rumors about Big Ass Fans from several of the company's agents.  (Docs. # 168-3 at 10-11, 14-15 and 168-4 at 13-14). While some of these agents simply thought that Big Ass Fans wanted to sell fans through their agency, others got the impression that Big Ass Fans was trying to establish a lighting division.  (Doc. # 168-4 at 14-17).  Marlow soon discovered that Robinson had approved Big Ass Fans as an Acuity distributor prior to his departure.[7]  *Id.* at 17-18.  Big Ass Fans had also placed a large order with Acuity for IBLs, on behalf of a Canadian customer.  *Id.* Moreover, Big Ass Fans was trying to negotiate a private labeling arrangement that would allow it to resell IBLs bearing its logo.  *Id.*  Acuity immediately placed a hold on the order and requested a conference call with Big Ass Fans.  *Id.* at 17-20.

In June of 2013, Whitaker spoke with Miller and Smith.  (Doc. # 168-1 at 21-22).  As CEO of Big Ass Fans, Smith assured Whitaker that the company would continue selling

---

7    The Defendants claim otherwise.    Specifically, Joe Miller, counsel for Big Ass Fans, declares that neither Bickley nor Robinson were involved in the business relationship between Acuity and Big Ass Fans. (Doc. # 120-5 at 3).

fans, but had no plans to compete with Acuity.  *Id.*  He also stated that he would not allow Bickley to work on any lighting-related projects, nor would he permit Bickley or Robinson to communicate with Acuity employees about employment opportunities.  *Id.*  With these assurances in mind, Acuity released Big Ass Fans' order.  (Doc. # 168-4 at 20-25).

This incident inspired Big Ass Fans to consider manufacturing a light themselves. (Doc. # 120-5 at 3).  They came up with the Big Ass High Bay LED, which is very similar to Acuity's IBL product, in terms of form and function.  *Id.*  However, Big Ass Fans intended to sell their light in the renovation/retrofit market, not the new construction market that Acuity targeted.  (Doc. # 120-11 at 3).

Despite being told to refer any future employment inquiries to the Human Resources Department (Doc. # 168-10 at 5-9) and the apparent truce between Acuity and Big Ass Fans, Bickley had contact with other Acuity employees.  Those contacts consisted of: contacting Jonathan Archer about submitting a resume (Doc. # 168-13 at 4-7), sitting in on an interview of Acuity's Vice President of Marketing David Grimm (Doc. # 168-8 at 6), and responding to Jay Dantzler, one of Acuity's Regional Sales Managers, who had asked him about possible employment opportunities with Big Ass Fans in Dallas.  (Doc. # 168-6 at 14, 25-27, 29-30, 37-38, 44; Doc. # 168-7 at 70, 72).

In September 2013, Dantzler received and accepted an employment offer from Big Ass Fans.  (Doc. # 186-6 at 31).  Bickley was copied on several emails discussing the details of the offer.  *Id.* at 42.  Shortly thereafter, Dantzler resigned from Acuity and turned in his electronic devices.[8]  *Id.*   Sheffield reviewed the devices and discovered

---

8    Acuity also sued Dantzler separately in Texas state court, alleging similar claims to the ones at issue here.  (Doc. # 25).  The current status of that lawsuit is unknown.

correspondence between Bickley and Dantzler. (Doc. # 168-3 at 17). This discovery prompted Acuity to file the instant action against Bickley, Robinson, and Big Ass Fans. (*Id.*; Doc. # 1).

As discovery proceeded in this action, Big Ass Fans continued to prepare for the launch of its High Bay LED. (Doc. # 120-5 at 3-4). Although a special sales group had handled lighting sales in the past, Big Ass Fans decided to reassign lighting to the general sales team, overseen by Bickley. (*Id.*; Doc. # 168-5 at 22). Accordingly, in December 2013, Bickley began attending meetings about lighting sales strategies. (Doc. # 168-5 at 22-24). Chief among Bickley's strategies was the Trial Installation Program, or "TIP," which offered existing customers a trial installation of the High Bay LED. *Id.* Bickley accompanied his team members on sales calls during this time and provided feedback about the TIP campaign to Smith. *Id.* at 24-29. Bickley also sought Robinson's advice on some of these matters. *Id.* at 30-31. Some of Acuity's agents, who had contracted with Big Ass Fans to sell fans, recall that Bickley and Robinson contacted them during this time and asked them if they were interested in selling the High Bay LED on commission. (Docs. # 168-21 at 4 and 168-22 at 4-8). Both agents declined these offers. *Id.* In February of 2014, Big Ass Fans finally began manufacturing its High Bay LED. (Doc. # 120-5 at 3-4).

Bickley continued to supervise the general sales force at Big Ass Fans until May of 2014, when he became the Lighting Sales Manager. (Doc. # 120-15 at 3). Lighting accounted for less than 10% of the sales made by his team from February to May. *Id.* Most of these sales were made in the retrofit market, rather than the new construction market. *Id.*

9

More than fifteen months after the filing of this action, the parties completed their protracted discovery efforts. (Doc. # 86). Defendants Bickley, Robinson, and Big Ass Fans then filed Motions for Summary Judgment. (Docs. # 120 and 121). The Court granted summary judgment in favor of the Individual Defendants and dismissed Acuity's claims against Bickley and Robinson for breach of the non-solicitation provision, breach of the non-disclosure provision, breach of the non-competition provision, and tortious interference with business relations. (Doc. # 202). The Court also dismissed Acuity's sole claim against Big Ass Fans for tortious interference with contractual relations.[9]  *Id.*  However, the Court denied Defendants' Motion for Summary Judgment as to Plaintiffs' claims against the Individual Defendants for breach of the return-of-property provision and violation of the KUTSA.  *Id.*  Both parties have moved for reconsideration of that Order.

## III.   Analysis

There are nine pending motions currently before the Court. (Docs. # 206, 207, 209, 210, 211, 213, 216, 221, and 223). Plaintiffs seek reconsideration of this Court's March 24, 2016 Memorandum Opinion and Order ("the Summary Judgment Order") (Doc. # 202) granting summary judgment in Defendants' favor on Counts One, Three, Four, and Seven, claiming the Court inadvertently and erroneously relied on Georgia case law that had been superseded by statute. (Doc. # 206).

The Individual Defendants have filed two inextricably intertwined motions regarding the Court's prior Orders with respect to damages, one seeking reconsideration of the

---

9    The Court engaged in a lengthy choice-of-law analysis in the Summary Judgment Order. Neither party has challenged that portion of the Court's analysis. Accordingly, Georgia law applies to the contract claims, while Kentucky law governs the tort claim.

Summary Judgment Order and one renewing a previous motion.  First, Bickley and Robinson ask the Court to reconsider its Summary Judgment Order (Doc. # 202), claiming that the Court did not address their argument that, apart from Rule 37 grounds, Plaintiffs' claim for recovery of their IBL development costs is legally deficient.  (Doc. # 209).  In a similar vein, the Individual Defendants have renewed their Rule 37 Motion to Exclude, asking the Court to bar Plaintiffs from introducing certain evidence pertaining to damages. (Doc. # 210).

Also before the Court are five unopposed Motions for Leave to Seal a Document by both parties (Docs. # 207, 211, 213, 216, and 223), and finally, Defendants' Motion for Oral Argument. (Doc. # 221).  First, the Court will address the parties' procedural motions and then the Court will turn to the parties' substantive motions.

## A.   *Motions for Leave to Seal a Document*

The Eastern District of Kentucky has established a procedure for sealing documents. In civil cases, a party seeking to file a sealed document shall electronically file a motion for leave to seal.  The motion must state why sealing is required and whether redaction could eliminate or reduce the need for sealing.  A motion for leave to seal is not required if the document is: (1) already subject to a protective order or (2) included within a category of documents considered sealed under a federal statute or federal rule of procedure, local rule, or standing order of this Court.  Joint General Order 11-01, § 8.1(a)(1).

Although each pending Motion for Leave to Seal is unopposed, the Court notes that there is a strong presumption in favor of public access to judicial documents.  "Only the most compelling reasons can justify non-disclosure of judicial records."  *In re Knoxville News Sentinel Co., Inc.*, 723 F.2d 470, 476 (6th Cir. 1983) (internal citations omitted).  This

11

principle applies to civil cases and criminal cases equally.   *See Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165, 1178-79 (6th Cir. 1983).

Therefore, a party seeking to seal court records must show "good cause" in support of its request.   *Proctor & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 227 (6th Cir. 1996).   "The right to access is not absolute;" rather, "[c]ourts have carved out several distinct but limited ... exceptions to the strong presumption in favor of openness."   *Brown & Williamson Tobacco Corp.*, 710 F.2d at 1179.   "The exceptions to the practice of maintaining openness in the courtroom fall into two broad categories: those based on the need to keep order and dignity in the courtroom and those which center on the content of the information to be disclosed to the public."   *Id.*   The Sixth Circuit has recognized that "certain privacy rights of participants or third parties" and "trade secrets" are significant interests which can outweigh the public's right to access.   *Id.* (citing *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 598 (1978)) (additional citations omitted).

Plaintiffs' Motion to Seal (Doc. # 207) asks the Court to seal exhibits attached to the Declaration of Geoffrey Marlow.   The declaration, which is filed separately as Exhibit D to Plaintiffs' Motion for Reconsideration, is not part of documents Plaintiffs request to seal. Specifically, Exhibit A consists of emails discussing Acuity's initiative to grow its presence in the renovation market, as well as the company's goals with respect to that initiative; a meeting schedule that Bickley organized; and a Renovation Kaizen.   (Sealed Doc. # 215). Good cause, premised on Plaintiffs' representations and the Court's review of the documents, supports sealing these documents.   Accordingly, Plaintiffs' Motion to Seal (Doc. # 207) is **granted** and the Clerk shall **maintain under seal** Doc. # 215.

12

Defendant Big Ass Fans has also filed a Motion to Seal (Doc. # 216) a deposition transcript marked "attorneys' eyes only," which this Court has previously found should be sealed. (Doc. # 203, Ex. 12). As this Court previously determined, disclosure of this document could have adverse business consequences for both parties, and there is good cause to seal. *Id.* at 2-3. Therefore, Defendant Big Ass Fans' Motion to Seal (Doc. # 216) is **granted** and the Clerk shall **maintain under seal** Doc. # 217.

The Individual Defendants have also filed several Motions to Seal. (Docs. # 211, 213, and 223). In support of their Motion for Reconsideration (Doc. # 209), Defendants ask the Court to seal two exhibits. (Doc. # 211). One details development costs, which has been designated "attorneys' eyes only." The other is the same deposition transcript that Big Ass Fans sought to have sealed, which is discussed immediately above, and has been previously ruled on by this Court. (Doc. # 203, Ex. 12). Good cause exists to seal both of the attached exhibits. The Individual Defendants have also filed a Motion for Leave to Seal (Doc. # 213) with four attached exhibits in support of their Renewed Rule 37 Motion. The Court has previously ruled that each of these exhibits should be sealed. (Doc. # 138, Exs. 6, 9, 11, and 15). Good cause remains for sealing each of the four exhibits. Lastly, in support of their combined Reply in Support of their Motion for Reconsideration and Renewed Rule 37 Motion to Exclude, Defendants ask the Court to seal three attached exhibits. (Doc. # 223). The Court has previously sealed all, or at least a portion of, each of these exhibits. (Docs. # 138, Ex. 6; 203, Exs. 6, 12; 117). For the same reasons, good cause remains for sealing each of these exhibits, including the previously unsealed portions of Exhibits 4 and 5. Accordingly, Defendants' Motions to Seal (Docs. # 211, 213, and 223) are **granted** and the Clerk shall **maintain under seal** Docs. # 212, 212-1, 214, 214-1, 214-

2, 214-3, 214-4, 224, 224-1, and 224-2.

### B.   *Motion for Oral Argument*

Defendants have requested oral argument on the three pending substantive motions (Docs. # 206, 209, and 210) pursuant to Local Rule 7.1(f), which provides that parties may request oral argument.  (Doc. # 221).  Not surprisingly, Plaintiffs filed a response opposing Defendants' motion.  (Doc. # 226).  Granting such a request is in the Court's discretion. The issues raised in the pending motions have been briefed extensively, and most are the subject of prior court orders.  The Court is intimately familiar with the claims and arguments in this case, and oral argument is not necessary to resolve the pending motions. Accordingly, Defendants' Motion for Oral Argument (Doc. # 221) is **denied**.

### C.   *Plaintiffs' Motion for Reconsideration*

#### 1.    Standards of Review

The Plaintiffs style their motion as one seeking relief under Federal Rule of Civil Procedure 60(b).  However, Plaintiffs' Motions for Reconsideration was filed exactly 28 days after entry of the Court's Summary Judgment Order, and therefore, Federal Rule of Civil Procedure 59(e), which permits a party to move to alter or amend a judgment within 28 days of its entry, is the more appropriate vehicle.  Because the label attached to a motion does not control its substance, and the Plaintiffs filed their Motion for Reconsideration within the 28-day time period established under Rule 59(e), the Court will review the motion under that rule, as opposed to Rule 60(b).[10]  *See Cockrel v. Shelby Cty.*

---

10    Although this procedural issue may seem inconsequential at first glance, the Court notes that applying the proper standard of review is critical, especially when a party seeks reconsideration of a grant of summary judgment.  Although the rules are similar, "[a]s a prerequisite to relief under Rule 60(b), a party must establish that the facts of its case are

*Sch. Dist.*, 270 F.3d 1036, 1047 (6th Cir. 2001).

"A court may grant a motion to alter or amend judgment only if there was '(1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice.'" *ACLU of Ky. v. McCreary Cty., Ky.*, 607 F.3d 439, 450 (6th Cir. 2010) (quoting *Intera Corp. v. Henderson*, 428 F.3d 605, 620 (6th Cir. 2005)). The grant or denial of a Rule 59(e) motion "is within the informed discretion of the district court." *Gen. Corp, Inc., v. Am. Int'l Underwriters*, 178 F.3d 804, 832 (6th Cir. 1999); *see also Leisure Caviar v. United States Fish and Wildlife Serv.*, 616 F.3d 612, 615 (6th Cir. 2010) ("A district court, generally speaking, has considerable discretion in deciding whether to grant [a Rule 59(e)] motion."). Here, the Plaintiffs claim that they are entitled to relief from the Court's Summary Judgment Order granting summary judgment in the Defendants' favor on Counts One, Three, Four, and Seven, because the Court "erroneously relied on pre-2011 Georgia law, which is inapplicable to the disputed restrictive covenants in this case." (Doc. # 206 at 1). The Plaintiffs do not seek reconsideration of the Court's dismissal of Count Five, which alleged tortious interference with business relations against Bickley and Robinson. *Id.*

---

within one of the [six] enumerated reasons contained in Rule 60(b) that warrant relief from judgment." *Lewis v. Alexander*, 987 F.2d 392, 396 (6th Cir. 1993). Rule 59(e) is a slightly different standard and is primarily used to correct fundamental legal errors.

More importantly, the standards of review on appeal diverge. A district court's decision on a Rule 60(b) motion is reviewed for an abuse of discretion. *See Burrell v. Henderson*, 434 F.3d 826, 831 (6th Cir. 2006). While a district court's decision on a Rule 59(e) motion to alter or amend is typically reviewed for an abuse of discretion as well, "a de novo standard of review is applied when the Rule 59(e) motion seeks review of a grant of summary judgment." *Cockrel v. Shelby Cty. Sch. Dist.*, 270 F.3d 1036, 1047 (6th Cir. 2001) (citing *Smith v. Wal-Mart Stores, Inc.*, 167 F.3d 286, 286 (6th Cir. 1999)).

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). If there is a dispute over facts that might affect the outcome of the case under governing law, then entry of summary judgment is precluded. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party has the ultimate burden of persuading the court that there are no disputed material facts and that he is entitled to judgment as a matter of law. *Id.* Once a party files a properly supported motion for summary judgment by either affirmatively negating an essential element of the non-moving party's claim or establishing an affirmative defense, "the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250. "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Id.* at 252.

## 2. Enforceability of Restrictive Covenants

Under the "blue pencil" doctrine, courts are permitted to cross out, as with a blue pencil, those provisions which render a covenant overbroad, and therefore, unenforceable. Prior to May 11, 2011, Georgia did not employ the "blue pencil" rule of severability to restrictive covenants contained in employment contracts. *See Advance Tech. Consultants, Inc. v. Roadtrac, LLC*, 551 S.E.2d 735, 737 (Ga. Ct. App. 2001). Absent such a rule, if one covenant in an agreement is unenforceable, then all are unenforceable.

However, unbeknownst to the Court, the Georgia legislature "passed a new, more lenient statutory provision governing the scope and enforceability of restrictive covenants" in 2010. *Cellairis Franchise, Inc. v. Duarte*, No. 2:15-cv-101-WCO, 2015 WL 6517487, at *5 (N.D. Ga. Oct. 21, 2015); *see also* GA. CODE ANN. § 13-8-50 *et seq.* Importantly, the

16

"blue pencil" rule of severability now applies to employment contracts.  GA. CODE ANN. § 13-8-53(d) ("Any restrictive covenant not in compliance with the provisions of this article is unlawful and is void and unenforceable; provided, however, that a court may modify a covenant that is otherwise void and unenforceable so long as the modification does not render the covenant more restrictive with regard to the employee than as originally drafted by the parties.").  If the Court exercises its discretion to "modify the restraint provision," it may only grant "the relief reasonably necessary to protect such interest or interests and to achieve the original intent of the contracting parties to the extent possible."  GA. CODE ANN. § 13-8-54(b).

Although the new Georgia statutes are more lenient regarding the scope and enforceability of restrictive covenants, there remains a reasonableness requirement that all restrictive covenants must satisfy.  "Under Georgia law generally, the enforceability of a restrictive covenant is determined by whether 'the covenant can be considered a reasonable restraint on competition, given the circumstances of a particular case.'" *Cellairis Franchise, Inc.*, 2015 WL 6517487, at *5 (quoting *Carson v. Obor Holding Co. LLC*, 734 S.E.2d 477, 481 (Ga. Ct. App. 2012)).  "Specifically, the restraint imposed must be reasonably limited and must be reasonably necessary to protect the interest of the party in whose favor it is imposed."  *Carson*, 734 S.E.2d at 481.  "Whether a restraint imposed by an employment contract is reasonable is a question of law for determination by the court, which considers the nature and extent of the trade or business, the situation of the parties, and all other circumstances."  *Cox v. Altus Healthcare and Hospice, Inc.*, 706 S.E.2d 660, 664 (Ga. Ct. App. 2011); *see also Early v. MiMedx Group, Inc.*, 768 S.E.2d 823, 829 (Ga. Ct. App. 2015).

The Stock Award Agreements[11] at issue in this lawsuit were executed in 2012. (Docs. # 120-1 at 1 and 168 at 3-5).  Accordingly, the new Georgia statutes should have

---

[11] Another agreement between Acuity and the Individual Defendants, concerning confidentiality, inventions, and non-solicitations ("the Ethics Agreement") has also been a subject of debate in this case.  In its Summary Judgment Order, the Court did not analyze any of the restrictive covenants in the Ethics Agreement because "Plaintiffs' case center[ed] on the Stock Award Agreement" and that agreement differed substantially from several of the substantive provisions in the Ethics Agreement.  (Doc. # 202 at 30, n.19).

In their Motion for Reconsideration, Plaintiffs raise this issue in a footnote, "request[ing] that the Court clarify its holding with respect to the Ethics Agreement," which is governed by Delaware law, as opposed to Georgia law, and includes an important attorneys' fee provision.  (Doc. # 206-1 at 3, n.2).  Defendants object to the Court's consideration of the Ethics Agreement, which was not referenced in any of Plaintiffs' pleadings.  (Doc. # 219 at 17).  In response, Plaintiffs vaguely argue that their claims under the Ethics Agreement remain viable.  (Doc. # 225 at 11-12).

Plaintiffs relied on the Ethics Agreement in their Response to Defendants' Motions for Summary Judgment.  (Doc. # 168 at 26-28).  Plaintiffs claimed that Sixth Circuit law permits plaintiffs to raise claims or arguments, not included in a complaint, later in the litigation, so long as the opposing party has adequate notice of them.  *Id.* at 26.  The parties dispute whether Defendants had adequate notice of any claims based on the Ethics Agreement.

The Court recognizes that Plaintiffs produced the Ethics Agreements, along with other documents, in response to Defendants's First and Second Set of Document Requests (Docs. # 168-26 and 168-27), and that the Ethics Agreements were discussed in three depositions.  (Docs. # 168-1 at 136-141, 168-8 at 86-93, and 168-9 at 9-19).  However, this evidence does not establish that Defendants had adequate notice that Plaintiffs were alleging breach of contract of the Ethics Agreements.  While Defendants may have been aware that the Ethics Agreement were relevant, they were not sufficiently notified that the Ethics Agreements formed the basis of any claim.  Plaintiffs filed four Complaints (Docs. # 1, 19, 35, and 67).  The Plaintiffs attached the Stock Award Agreements to all four Complaints, *not* the Ethics Agreements, in support of their claims.  Although Plaintiffs' counsel sent Defendants' counsel a letter attempting to clarify and notify Defendants that Plaintiffs based their claims on the Ethics Agreement, this failed to cure the confusion.  (Doc. # 168-28).  This letter was sent on June 29, 2015 – before the dispositive motion deadline, but approximately two and a half months *after* discovery had closed.  (Doc. # 86).  Accordingly, Plaintiffs did not sufficiently plead claims based upon the Ethics Agreements and those agreements cannot support Plaintiffs' breach of contract claims.  There was no ambiguity in the Complaint concerning the agreements which formed the basis of Plaintiffs' claims, nor did Plaintiffs adequately rectify this deficiency during the course of the proceedings.  *See Carter v. Ford Motor Co.*, 561 F.3d 562, 566 (6th Cir. 2009) ("[W]here language in a complaint is ambiguous," the Sixth Circuit employs a "course of the proceedings test to determine whether defendants have received notice of the plaintiff's claims."); *see also Moore v. City of Harriman*, 272 F.3d 769, 772-74 (6th Cir. 2001) ("Subsequent filings in a case may rectify deficiencies in the initial pleadings.").

been applied and failure to do so constitutes a clear error of law. Therefore, the Court will reconsider each of Plaintiffs' claims alleging breach of the restrictive covenants, as well as their tortious interference claim against Big Ass Fans, to determine whether relief is warranted under Rule 59(e).[12]

### 3.    Non-Competition Provision

In its Summary Judgment Order, the Court determined that because the non-compete provision was overbroad and unenforceable, Defendants were entitled to summary judgment on Count Four of Plaintiffs' Complaint, which alleged breach of contract based on that provision. (Doc. # 202 at 27-29). Specifically, the Court held that the non-compete provision, which applied nationwide, was an unreasonable restriction on Bickley,[13] who served as the RVP for Acuity's South Central Region. *Id.* While the Court recognized that Acuity's RVPs had occasional interaction with other regions, the Court found such a justification to be insufficient under Georgia law. *Id.* at 29 (citing *Hulcher Servs. v. R.J. Corman R.R. Co.*, 543 S.E.2d 461, 466 (Ga. Ct. App. 2000). Moreover, the Court reasoned:

> [T]his clause totally fails to strike the necessary balance between "the employee's right to earn a living and ability to determine with certainty the geographic area boundaries in which post-employment activities are restricted" against "the employer's interest in customer relationships that its former employees established for the employer and its right to protect itself from the risk that the former employee might use such relationships to unfairly appropriate the employer's existing customers." [*Hulcher*, 543 S.E.2d at 466.]

---

12    Plaintiffs do not seek reconsideration of the Court's grant of summary judgment on Count Five, Plaintiffs' tortious interference with business relations claim against Bickley and Robinson. (Doc. # 206).

13    Acuity alleges breach of contract for violation of the non-competition provision only against Bickley, and not against Robinson. (Doc. # 67 at 24-25).

In their Motion for Reconsideration, Plaintiffs argue that the parties had not "briefed the issue of the enforceability of the non-competition provision with respect to its geographical reach" and highlight evidence in an effort to show that RVPs have routine contacts and responsibilities involving other regions and that the "role is national, rather than regional, in scope." (Doc. # 206-1 at 5-9). Alternatively, the Plaintiffs ask that the Court "blue pencil the non-competition provision such that it is enforceable" under Georgia law. *Id.* at 9-10. In response, the Individual Defendants claim that the non-competition provision is overbroad and unreasonable in its geographic area, as well as the scope of the prohibited activities, and argue that the Court should not exercise its discretion to cure the covenant's invalidity. (Doc. # 219 at 3-11).

The non-competition provision at issue in this case provides as follows:

In the event that Grantee,

(i)      voluntarily resigns from the Company;

(ii)     is Terminated for Cause (as defined above); or

(iii)    declines to sign a Confidential Severance Agreement and Release offered by the Company in the event of a termination for any reason other than a Termination for Cause (including, for example, as a result of a position elimination)

Grantee acknowledges and agrees that during his/her employment, and for twelve (12) months after the Date of Termination, he/she has not and will not, directly or indirectly, engage in, provide, or perform any Employee Services on behalf of any person or entity (or, if organized into divisions or units, any distinct division or operating unit) *in the Territory that derives revenue from providing goods or services substantially similar to those which comprise the Company's Business.* Notwithstanding the foregoing, if the Company terminates Grantee's employment for any reason other than a Termination for Cause (including, for example, as a result of a position elimination), and Grantee elects to sign a Confidential Severance Agreement and Release offered by the Company, the period covered by this non-competition covenant will be reduced to either, (i) the time within which severance

20

> payments are scheduled to be paid to Grantee under such agreement, or (ii) if severance is paid to Grantee in a lump sum, the number of weeks of Grantee's then-current regular salary are used to calculate such lump sum payment; provided, however, that the restrictive period calculated hereunder may not, in any event, exceed twelve (12) months following the Date of Termination.

(Doc. # 67-2 at 11-12).

While the new Georgia statutes affect the enforceability of non-competition provisions, certain requirements remain. Non-competition restrictions are permitted, "so long as such restrictions are reasonable in time, geographic area, and scope of prohibited activities ." GA. CODE ANN. § 13-8-53(a). Therefore, while employers have been extended additional latitude in drafting restrictive covenants, those restrictions must still be reasonable. "In determining the reasonableness of a restrictive covenant between an employer and an employee ... a court may consider the economic hardship imposed upon an employee by enforcement of the covenant." GA. CODE ANN. § 13-8-58(d). "As a question of law, then, a court must determine reasonableness through a three-part examination of the covenant, including its (1) duration, (2) territorial coverage, and (3) scope of activity prohibited." *Cellairis Franchise, Inc.*, 2015 WL 6517487, at *5; *see also LifeBrite Lab., LLC v. Cooksey*, No. 1:15-cv-4309-TWT, 2016 WL 7840217, at *5 (N.D. Ga. Dec. 9. 2016). "This analysis is applied strictly in employer-employee relationships." *Cellairis Franchise, Inc.*, 2015 WL 6517487, at *5.

### a.   Duration

With respect to the duration requirement, Georgia law directs courts to apply a rebuttable presumption when "determining the reasonableness in time of a restrictive covenant sought to be enforced after a term of employment." GA. CODE ANN. § 13-8-57(a).

21

"In the case of a restrictive covenant sought to be enforced against a former employee," which includes a non-competition provision, "a court shall presume to be reasonable in time any restraint two years or less in duration and shall presume to be unreasonable in time any restraint more than two years in duration, measured from the date of the termination of the business relationship." GA. CODE ANN. § 13-8-57(b). Here, the Agreement limits the non-competition provision to "twelve (12) months following the Date of Termination." Therefore, the duration of the non-competition provision easily satisfies the requirements of § 13-8-57.

The other two requirements, territorial coverage and scope of activity prohibited, warrant additional consideration. The new Georgia statutes provide that "[w]henever a description of activities, products, or services, or geographic areas is required ... any description that provides fair notice of the maximum reasonable scope of the restraint shall satisfy such a requirement, even if the description is generalized or could possibly be stated more narrowly to exclude extraneous matters." GA. CODE ANN. § 13-8-53(c)(1). However, the "post-employment covenant shall be construed ultimately to cover only so much of such estimate as relates to the activities actually conducted, the products or services actually offered, or the geographic areas actually involved within a reasonable period of time prior to termination." *Id.*

### b.   Territorial Coverage

Regarding territorial coverage, a non-competition provision must alert the employee to the potential geographic areas where the restriction applies. *Id.* Under the new Georgia statutes, "[t]he phrase 'the territory where the employee is working at the time of termination' or similar language shall be considered sufficient as a description of

geographic areas if the person or entity bound by the restraint can reasonably determine the maximum reasonable scope of the restraint at the time of termination." GA. CODE ANN. § 13-8-53(c)(2). Here, the Agreement restricts a former employee from competing with Acuity "in the Territory that derives revenue from providing goods or services substantially similar to those which comprise the Company's Business." (Doc. # 67-2 at 12). The "Territory" is generally defined as the United States. *Id.* at 9. Although this language is broad, it allows a former employee to "reasonably determine" the "maximum scope" of the restraint, and it is a sufficient description of the geographic area. GA. CODE ANN. § 13-8-53(c)(2).

However, the territorial coverage must still be reasonable. The new Georgia statutes impose a rebuttable presumption of reasonableness for territorial coverage. "A geographic territory which includes the areas in which the employer does business at any time during the parties' relationship, even if not known at the time of entry into the restrictive covenant, is reasonable provided that" either: the "total distance encompassed by the provisions of the of the covenant is also reasonable" or the "agreement contains a list of particular competitors as prohibited employers for a limited period of time after the term of employment or a business or commercial relationship." GA. CODE ANN. § 13-8-56(2).

Comparing the statutory presumption with the present agreement, the Court finds that the nationwide restriction is unreasonable. The Agreement does not contain a list of particular competitors as prohibited employers; thus, the "total distance encompassed" by the non-competition provision must be reasonable. Plaintiffs' attempts to persuade the Court to reconsider its prior conclusion that the nationwide non-competition provision was unreasonable fail. Plaintiffs assert that they sell "lighting products throughout the entire

23

United States and internationally," and that an RVP could be expected to work throughout that territory. (Doc. # 206-1 at 8). Plaintiffs also claim that RVPs "had access to [Acuity's] confidential and trade secret information pertaining to its customers, sales, marketing strategies" and "routinely participated in and/or led [Acuity's] company-wide strategic and/or process improvement initiatives that were national in scope." *Id.* Therefore, Plaintiffs suggest that the RVP role is "national, rather than regional, in scope" and that their "legitimate business interests in its confidential and trade secret information, as well as its customer relationships are best protected by the enforcement of a nationwide non-competition provision." *Id.*

Although Plaintiffs may believe that their interests are best protected by a nationwide non-competition provision, those interests must be weighed against former employees' interests and right to earn a living. *See Hulcher*, 543 S.E.2d at 466. The new Georgia statutes acknowledge that trade secrets, valuable confidential information, substantial relationships with specific prospective or existing customers, customer goodwill, and extraordinary or specialized training are "legitimate business interests." GA. CODE ANN. § 13-8-51(9); *see also NCR Corp. v. Manno*, No. 3:12-cv-121-TCB, 2012 WL 12888663, at *6 (N.D. Ga. Oct. 26, 2012) (finding that access to valuable confidential information and trade secrets is an interest protectable by a non-compete, but that the interest in substantial relationships with customers is more important). However, Plaintiffs' legitimate business interests in its confidential and trade secret information and customer relationships are also protected by other restrictive covenants in the Agreement, namely the non-disclosure and non-solicitation provisions.

24

Moreover, Bickley was a *regional* sales vice president.  He was "assigned to a specific geographic region for management of they day-to-day sales process."  (Doc. # 206-1 at 6).  The regional nature of his job is made apparent by Plaintiffs' pleadings. Bickley functioned as the "general manager" for the South Central Region, making "all operational, financial, personnel/staffing, and strategic decisions within [that] region in order to drive the sale of [Acuity's] products."  (Doc. # 168 at 3).  "Bickley was expected to, and did, routinely travel throughout his region visiting customers, training agents on [Acuity] products and making sales calls with them, and occasionally meeting with larger end-user customers ... to help solidify big sales."  *Id.* at 42.  "Indeed, Bickley and his team's performance was primarily measured by sales in their region."  *Id.* at 43.

The Court recognizes that as a high-level employee, Bickley was involved in the "overall management of corporate sales and marketing strategy on a national level," attended meetings "focused on company-wide strategy," was occasionally tasked with "leading company-wide strategic and/or process improvement initiatives," and had "knowledge of and access to trade secret and confidential information concerning [Acuity's] customers, products, and pricing, as well as to its operational, marketing, and sales strategies."  (Doc. # 206-1 at 6-9).  However, his occasional and incidental contacts and duties outside of his region do not justify a nationwide non-competition restriction.

Therefore, the Court continues to believe that the non-competition provision fails to strike the necessary balance between "the employee's right to earn a living and ability to determine with certainty the geographic area boundaries in which post-employment activities are restricted" against "the employer's interest in customer relationships that its former employees established for the employer and its right to protect itself from the risk

that the former employee might use such relationships to unfairly appropriate the employer's existing customers." *Hulcher*, 543 S.E.2d at 466; *see also Pedowitz Group, LLC v. Ogden*, No. 1:13-cv-839-RLV, 2013 WL 11319834, at *6 (N.D. Ga. Nov. 29, 2013) (finding geographic limitation of "North America" to be unreasonable). Put simply, Plaintiffs' interests in a nationwide non-competition provision are outweighed by Bickley's interests and right to earn a living.

Because the non-competition provision is not enforceable as written, the Court may modify the covenant. GA. CODE ANN. §§ 13-8-53(d); 13-8-54(b).[14] Following the guidance from the Georgia legislature, the Court will "modify the restraint provision ... grant[ing] only the relief reasonably necessary to protect such interest or interests" and attempt "to achieve the original intent of the contracting parties to the extent possible." GA. CODE ANN. § 13-8-54(b). Accordingly, the Court will narrow the territorial coverage from the entire United States to only the South Central Region that Bickley was assigned. Therefore,

---

14    Defendants ask the Court to refrain from exercising its discretion to cure the non-competition covenant's invalidity. (Doc. # 219 at 11-14). In support of its decision to modify the territorial coverage, the Court relies heavily on *LifeBrite Lab., LLC v. Cooksey*, No. 1:15-cv-4309-TWT, 2016 WL 7840217 (N.D. Ga. Dec. 9, 2016). *See also NCR Corp.*, 2012 WL 12888663, at *7.

In *LifeBrite*, the district court engaged in a thorough and compelling examination of Georgia courts' newfound ability to "blue pencil" unenforceable restrictive covenants: "The statute empowers courts to 'modify' contracts. But the question in this case is whether 'modify' means that courts may only excise offending language or whether courts are empowered to actually reform and rewrite a contract. Clearly the former is permitted under the statute, but the latter is an issue of first impression in Georgia." *Id.* at *6.

While the new Georgia statutes "clearly indicated a change in policy from the stringent position on employment contracts that Georgia courts had previously taken ... the question is how much of a change in policy it entailed." *Id.* at *7. The district court cautioned: "the blue pencil marks, but it does not write." *Id.* Accordingly, a court can "narrow over-broad territorial designations" and "may limit an area, making it reasonable," but "courts may not completely reform and rewrite contracts by supplying new and material terms from whole cloth." *Id.* Here, the Court is simply narrowing the supplied territorial designation.

Bickley is restricted from competing with Acuity in six states: Texas, Oklahoma, Arkansas, Louisiana, Mississippi, and New Mexico.  (Docs. # 120-15, 168 at 2, and 168-5 at 43).

### c.     Scope of Activities Prohibited

The scope of activities prohibited by the non-competition provision must also be sufficiently described in the Agreement, and reasonable.  GA. CODE ANN. §§ 13-8-53(a); (c)(2).  Pursuant to the new Georgia statutes, "[a]ctivities, products, or services shall be considered sufficiently described if a reference to the activities, products, or services is provided and qualified by the phrase 'of the type conducted, authorized, offered, or provided within two years prior to termination' or similar language containing the same or a lesser time period."  GA. CODE ANN. § 13-8-53(c)(2).  "The scope of competition restricted is measured by the business of the employer."  GA. CODE ANN. § 13-8-56(3).

Here, the Agreement prohibits a former employee from "directly or indirectly, engag[ing] in, provid[ing], or perform[ing] any Employee Services on behalf of any person or entity (or, if organized into divisions or units, any distinct division or operating unit) in the Territory that derives revenue from providing goods or services substantially similar to those which comprise the Company's Business."  (Doc. # 67-2 at 12).  The Agreement defines "Employee Services" as "the duties and services of the type conducted, authorized, offered, or provided by the Grantee in his/her capacity as an employee on behalf of the Company within twelve (12) months prior to the Date of Termination."  *Id.* at 9.  The "Company's Business" is defined as "the design, manufacture, and/or sale of one or more of [a list of specific products and categories of products] and any related products and/or services."  *Id.* at 8-9.  Therefore, the language of the Agreement provides fair notice to employees and satisfies the description requirement.

27

In addition to the notice requirement, the scope of the activities prohibited must be reasonable. The Court's Summary Judgment Order did not analyze whether the scope of activities prohibited by the non-competition provision was reasonable. (Doc. # 202). Consequently, the Plaintiffs did not address the reasonableness requirement in their Motion for Reconsideration. (Doc. # 206). However, Defendants did raise this issue in their Response, claiming that the non-competition provision "places no readily ascertainable limit on the scope of prohibited activities." (Doc. # 219 at 9-11). Specifically, Defendants argue that Plaintiffs' reading of the provision would "prevent Bickley from accepting any position for which he was qualified with any company having any presence, no matter how negligible, in the lighting industry," which renders the restriction overbroad and unenforceable. *Id.* at 9. In support of this argument, Plaintiffs cite Georgia case law refusing to "enforce provisions which prohibit an employee form working in any particular industry in any capacity or which restrict activities that threaten no legitimate interest of the employer." *Id.* (citing *Atlanta Bread Co. Int'l, Inc. v. Lupton-Smith*, 663 S.E.2d 743, 747 (Ga. Ct. App. 2008)). Defendants also rely on the substantial economic hardship the restriction imposes on Bickley. (Doc. # 219 at 10).

In their Reply, Plaintiffs disagree with Defendants' broad portrayal of the non-competition provision, claiming that the provision is "sufficiently tailored" in its scope of prohibited activities. (Doc. # 225 at 4-7). Contrary to Defendants' "reading" of the provision, Plaintiffs contend that "Bickley was not prohibited from working in *any* role – only in a role 'substantially similar' to his own (management of lighting sales)." *Id.* at 5. Nor does the provision prohibit him from working for "*any* company." *Id.* Instead, Bickley is only prohibited from working for a company (or division within a company) "that derives

revenue from the sale or provision of goods or services substantially similar to the specific goods and services that [Acuity] currently sells and provides." *Id.* In fact, Plaintiffs suggest that the "role Bickley first claimed he was taking at [Big Ass Fans] – head of sales for its fan division – would have been compliant with the terms of the provision, even if [Big Ass Fans] had launched its separate lighting division." *Id.* at 6.

Even before the new Georgia statutes were enacted, the reasonableness of the scope of prohibited activities was dependent upon whether the activities prohibited extended beyond the activities or services that the former employee provided for the employer seeking enforcement of a non-competition provision. *See e.g., Harville v. Gunter*, 495 S.E.2d 862 (Ga. Ct. App. 1998); *see also Wright v. Power Indus. Consultants*, 508 S.E.2d 191 (Ga. Ct. App. 1998), *overruled on "blue pencil"/severability grounds by Advance Tech. Consultants, Inc. v. Roadtrac, LLC*, 551 S.E.2d 735 (Ga. Ct. App. 2001). Accordingly, if the non-competition provision forbids the former employee from competing with the company only "in circumstances where [his] responsibilities and duties are substantially similar to those performed by [him] for the employer, the "provision is narrowly tailored in scope of activities prohibited and is permissible." *Reardigan v. Shaw Indus., Inc.*, 518 S.E.2d 144, 147-148 (Ga. Ct. App. 1999) (internal citations and quotation marks omitted); *see also Elec. Data Sys. Corp. v. Heinemann*, 459 S.E.2d 457 (Ga. Ct. App. 1995).

The Agreement at issue here is appropriately tailored. Bickley is only prohibited from performing "the duties and services of the type conducted, authorized, offered, or provided by" him in the employment capacity he had with Acuity for the "twelve (12) months prior to the Date of Termination." (Doc. # 67-2 at 12). The non-competition provision is

also limited to entities that "derive revenue from providing goods or services substantially similar to those which comprise the Company's Business." *Id.* Furthermore, the Agreement specifies that Acuity engages in "the design, manufacture, and/or sale of one or more of [a list of specific products and categories of products] and any related products and/or services." *Id.* at 8-9.

Put simply, Bickley is prohibited from working in a substantially similar management position that involves the sale of certain lighting products. Under Georgia law, "[s]uch narrow tailorings protect the employer to a sufficient degree while not imposing unreasonable restrictions on the employees." *Reardigan*, 518 S.E.2d at 148 (internal citations and quotation marks omitted). Thus, this portion of the non-competition provision is enforceable as written and does not need to be modified by the Court. Having found that the non-competition provision is enforceable (as modified), the Court must consider the Individual Defendants' Motion for Summary Judgment, which argued that Plaintiffs do not have a viable claim for breach of contract based on the non-competition provision.[15]

---

15  In another attempt to convince the Court that the non-competition provision is unenforceable, Defendants allege that the Stock Award Agreement constitutes a securities law violation, which renders the covenant unenforceable. (Doc. # 120-1 at 24-27).

Form S-8 is a filing with the SEC, used by publicly-traded companies to register securities that will be offered to its employees via benefits or incentive plans. The Securities Exchange Act of 1933 (15 U.S.C. § 77A *et seq.*) requires that these registration forms provide essential facts and be filed to disclose important information, in an effort to inform investors and prohibit fraud in the sale of securities. In accordance with that goal, companies are required to provide a prospectus, detailing "material information regarding the plan and its operations that will enable participants to make an informed decision regarding investment in the plan." (Form S-8, p. 6).

It is unclear whether the Individual Defendants are alleging that Plaintiffs violated § 12(a)(2) of the Securities Exchange Act of 1933 (15 U.S.C. § 77L(a)(2)), which creates liability for an individual or entity offering or selling a security by means of a prospectus or oral communication that includes an "untrue statement of a material fact or omits to state a material fact necessary in order to make the statements ... not misleading." *Id.* What is

### d.    Genuine Issues of Material Fact Exist

Because the Court has reconsidered its Summary Judgment Order at Plaintiffs' request, and determined that the non-competition provision is enforceable, the merits of Defendants' Motion for Summary Judgment (Doc. # 120) must be addressed.

In Georgia, the elements of a breach of contract claim are "the breach and the resultant damages to the party who has the right to complain about the contract being broken." *Budget Rent-a-Car of Atl., Inc. v. Webb*, 469 S.E.2d 712, 713 (Ga. Ct. App. 1996). In their Motion for Summary Judgment, the Defendants made a multitude of arguments based on both the breach element and the damages element.  The Individual Defendants' Motion for Reconsideration (Doc. # 209) reiterates and further develops their previous arguments regarding Plaintiffs' damages claims.   The Court will address these two elements, and the arguments related thereto, in turn.

### i.    Breach

Regarding breach, the Individual Defendants argue that Bickley is entitled to summary judgment on the non-competition provision because his job at Big Ass Fans was not similar to his job and duties at Acuity, and thus, Plaintiffs cannot demonstrate a breach of the covenant.  (Doc. # 120-1 at 27-30).  Specifically, the Individual Defendants assert that "Bickley's job at [Big Ass Fans] was nothing like his job at Acuity," and point to the

---

clear, however, is that Bickley has not asserted a cause of action against Plaintiffs for a securities violation.  More importantly, the non-competition restriction, as well as the other covenants pertaining to non-solicitation and confidentiality, were attached and incorporated by reference into the Stock Award Agreement.  (Doc. # 120-2 at 5).  Therefore, the Court declines to hold that the non-competition provision is unenforceable as a violation of securities laws.

difference in distribution channels and target markets between Acuity and Big Ass Fans. *Id.* at 28-29. Because Bickley's role with Big Ass Fans was not substantially similar to his responsibilities and duties at Acuity, the Defendants claim that his employment with Big Ass Fans does "not exploit or threaten any customer relationships developed at Acuity." *Id.* at 29-30. Accordingly, the Individual Defendants argue that "under any reasonable construction of the non-competition provision, Bickley did not perform duties or services of the type conducted, authorized, offered, or provided by Bickley on behalf of Acuity." *Id.* at 30.

In response, Plaintiffs argue that they have at least raised genuine issues of material fact on this point. First, Plaintiffs claim that Defendants' characterization of Bickley as a "high-level, hands-off manager of independent agents with little to no involvement in [Acuity's] 'actual sales' and marketing process" is false. (Doc. # 168 at 42). Additionally, Plaintiffs argue that the differences in distribution channels and target markets that the Defendants attempt to rely on are irrelevant. *Id.* at 42-45. Thus, Plaintiffs claim that "Bickley's roles at [Big Ass Fans] – first overseeing an inside sales force team selling all [Big Ass Fan] products, including lights, and then overseeing an inside sales force devoted solely to lights – largely mirror those he provided to [Acuity]." *Id.* at 43.

The Individual Defendants cite to *Atlanta Bread Co.* in support of their arguments. 663 S.E.2d 743. In *Atlanta Bread Co.*, the Georgia Court of Appeals held that a non-competition provision which contained no territorial limitation, prevented the party from engaging in any capacity with the bakery/deli business, and failed to specify the restricted activities with sufficient particularity was unreasonable. *Id.* at 747. As an illustration of the provision's unreasonableness, the court explained that the non-compete would prevent the

party from "engaging in any capacity within the bakery/deli business," even as a janitor. *Id.*

However, that case is not instructive here for several reasons.[16] First, the court was applying pre-2011 Georgia law, which did not permit the court to modify the restrictive covenant to render it reasonable and enforceable. Moreover, while that case may lend support to the proposition that Georgia disfavors non-competition provisions which prohibit employment in an entire industry, the non-competition provision at issue in this case is not so restrictive.

As modified, the non-competition provision prohibits Bickley from working in a substantially similar management position that involves the sale of certain lighting products in Texas, Oklahoma, Arkansas, Louisiana, Mississippi, and New Mexico for a period of twelve months following his termination. Therefore, if his job at Big Ass Fans violates this restriction, the non-competition provision has been breached, and Plaintiffs have a breach of contract claim based upon such breach.

Several disputes of material fact prevent Defendants' Motion for Summary Judgment from being granted. First, and critically, the Court notes that there is a lack of discernible evidence in the record concerning the locations where Bickley's duties and responsibilities at Big Ass Fans take him. Bickley's job at Big Ass Fans is to "supervise a 150-person inside sales force selling [Big Ass Fans] products," but the Court is unable to determine where his sales force operates, where his customer contacts are located, among other

---

16    The Court also finds the other cases Defendants cite to be largely unhelpful as well. Each case considers the enforceability of the non-competition provision and are focuses on the reasonableness of the parameters. (Doc. # 120-1 at 28-30 (citing *Harville v. Gunter*, 495 S.E.2d 862).

important questions.  (Doc. # 120-1 at 29).  This material fact alone precludes summary judgment.

In addition, there are factual disputes concerning the timing and depth of Bickley's involvement in Big Ass Fans' lighting sales efforts.  Although the Defendants assert that Bickley's first involvement with Big Ass Fans' lighting division did not occur until ten months after he started working for them, the evidence in the record establishes that there are genuine disputes regarding the time line.  (Doc. # 120-1 at 29).  Specifically, Bickley is alleged to have helped Big Ass Fans develop a lighting division and attended a lighting trade show in his first month of employment.  (Doc. # 168 at 43, 168-5 at 15-16).  Bickley was also invited to meetings with Big Ass Fans' Business Development Manager and Engineer who were spearheading the company's efforts to enter the lighting industry.  (Doc. # 168-5 at 12).  Likewise, the Court also finds that the similarity in Bickley's roles, the distribution channels, and the target markets are factual issues better left to a jury.  These genuine issues of material fact, among others, will determine whether Bickley violated the non-competition provision (as modified), and must be resolved by a jury.

### ii.    Damages

"Typically plaintiffs seek injunctive relief to enforce non-compete agreements, but, as with the breach of any contract provision, money damages may be sought for breach of a restrictive covenant."  *Direct Response Prod., Inc. v. Thomas*, No. 1:13-cv-1526-WSD, 2013 WL 5890473, at *3 (N.D. Ga. Nov. 1, 2013).  "In Georgia, [t]he damages recoverable for breach of a restrictive covenant are lost profits as well as the loss of customers, the loss of employees, and the decreased value of the business property purchased in reliance on the covenant."  *Id.* (internal citations and quotation marks omitted).  "Indeed, it has been

stated that recoverable damages are simply all damages incident to the breach."  *Id.*

"Plaintiffs seek the entry of an injunction[17] against Bickley precluding him from continuing to work in his competitive position as provided by the terms of the ... Agreement, as well as money damages."  (Doc. # 168 at 46).  However, in their Motion for Summary Judgment, the Individual Defendants asked the Court to enter summary judgment in their favor because "the record contains no evidence at all regarding competitive damages allegedly sustained by Plaintiffs as a result of the breach of the non-compete."  (Doc. # 120-1 at 30).

As evidence of their money damages, Plaintiffs claim to have "quantif[ied] the benefit gained by Bickley's involvement in the development, marketing, and sale of the Big Ass High Bay LED" by relying on "the cost of developing [their] own competitive product, the IBL."  (Doc. # 168 at 46).  "Armed with Bickley's knowledge and expertise," Plaintiffs suggest that Big Ass Fans "gained a significant advantage in bringing its own high bay LED light to market."  *Id.*  "Accordingly, Plaintiffs seek the costs of bringing its IBL product to market as damages for Bickley's violation of his non-compete."  *Id.*

The Individual Defendants contest this damages claim, arguing that there was "no showing of any causal connection between Bickley's supposed breach of the non-compete covenant and the development of [Big Ass Fans'] High Bay LED."  (Doc. # 182 at 14).  Nor has there been any "showing that the cost to develop Plaintiffs' IBL product, the sole

---

17    Neither party devotes time to whether an injunction is available.  While Plaintiffs could have sought a preliminary injunction, they did not do so.  Therefore, the Court simply notes that it is doubtful that the non-competition provision currently retains any force or effect that would permit the court to enjoin Bickley's employment at Big Ass Fans.  *See e.g.*, *Rinks v. Courier Dispatch Group, Inc.*, No. 1:01-cv-678-JOF, 2002 WL 32093321, at *4 (N.D. Ga. Jul. 17, 2002).

damage alleged by Plaintiffs for the non-compete breach, [in] any way approximates the damages proximately flowing from such a breach." *Id.* In response, Plaintiffs point to Georgia case law permitting "all damages incident to the breach," and remind the Court that the new Georgia statutes direct courts to "enforce a restrictive covenant by any appropriate and effective remedy available at law or equity" as support for this damage claim. (Doc. # 168 at 45)

While § 13-8-58(c) does require enforcement of restrictive covenants by "any appropriate and effective remedy," the Court's enforcement of a restrictive covenant must also square with traditional breach of contract principles. "Damages growing out of a breach of contract, in order to form the basis of a recovery, must be such as can be traced solely to the breach, must be capable of exact computation, must have arisen naturally and according to the usual course of things from such breach, and must be such as the parties contemplated as a probable result of the breach." *Webster v. Purdy*, 303 S.E.2d 521, 522 (Ga. Ct. App. 1983) (finding no damages where there was no evidence of lost income or any other injury as a result of the breach of a covenant not to compete). Thus, the damages must be causally-connected to the alleged breach and the amount of damages sought cannot be based on speculation. *See Direct Response Prod., Inc.*, 2013 WL 5890473, at *4.

Plaintiffs' attenuated damages claim, and the corresponding arguments, surfaced earlier in this litigation. In their Second Motion to Compel, Plaintiffs asked the court to compel Defendant Big Ass Fans to produce documents responsive to their requests for financial (profit and other) information related to the sale of Big Ass Fans' lighting products. (Doc. # 87). Despite the lenient discovery rules, Magistrate Judge Wier denied Plaintiffs'

36

Motion to Compel and concluded that:

> [Big Ass Fans'] alleged ill-gotten profits, under an unjust enrichment theory, are only theoretically available as damages to Acuity under the KUTSA claim, *see* KRS 365.884 (permitting recovery of actual losses and otherwise unaccounted-for unjust enrichment amounts), but Acuity did not sue [Big Ass Fans] under KUTSA. (Doc. # 67 at 29). Acuity sued [Big Ass Fans] only on the tortious interference claim (a claim addressing competition and solicitation, not specifically trade secrets). *Id.* at 33.

(Doc. # 93 at 4). This analysis continues to be persuasive and the Court adopts Magistrate Judge Wier's conclusions as its own.

In an obvious attempt to clear the evidentiary hurdle created by the Court's prior rulings (Docs. # 93 and 201), which prevented Plaintiffs from discovering Big Ass Fans' profits related to the sale of its lighting products and excluded other evidence of damages for violation of the discovery rules, Plaintiffs rely on their own costs of bringing the IBL product to market as damages for Bickley's alleged violation of his non-compete. However, this is nothing more than a reverse engineering of the arguments Plaintiffs made, and Magistrate Judge Wier rejected, when they sought documents related to Big Ass Fans' lighting sales profits. Because Plaintiffs were unable to discover the necessary financial information from Big Ass Fans, they speculate and suggest that their costs would be equal or comparable to Big Ass Fans' alleged financial advantage. However, Plaintiffs' unjust enrichment theory of damages, which claims that Big Ass Fans gained an unfair advantage in bringing its own high bay LED light to market, is only theoretically available under the KUTSA claim, not Plaintiffs' claim for breach of the non-compete. Moreover, Plaintiffs' claimed damages, which occurred before Bickley left Acuity and joined Big Ass Fans, cannot be traced to Bickley's alleged breach of the non-competition provision. *See Webster v. Purdy*, 303 S.E.2d at 522; *see also Direct Response Prod., Inc.*, 2013 WL

5890473, at *4.

Nevertheless, Plaintiffs' claim for breach of contract based on the non-competition provision cannot be dismissed because of a lack of actual damages.  In Georgia, "[i]n every case of breach of contract the injured party has a right to damages, [and] if there has been no actual damage, the injured party may recover nominal damages sufficient to cover the costs of bringing the action."[18]  *Botterbusch v. Preussag Int'l Steel Corp.*, 609 S.E.2d 141, 146-47 (Ga. Ct. App. 2004).  Therefore, although only nominal damages are possible, the Individual Defendants are not entitled to summary judgment on Count Four of Plaintiffs' Complaint, which alleges breach of contract based on the non-competition provision.  Accordingly, Plaintiffs' Motion for Reconsideration (Doc. # 206) is **granted** and the Individual Defendants' Motion for Summary Judgment (Doc. # 120) is **denied** with respect to that claim.

### 4.      Non-Disclosure Provision

Prior Georgia law required non-disclosure provisions to be limited in duration.  If a non-disclosure provision relating to the protection of confidential information was not limited in time or provided for too long of a time-period, Georgia courts would strike it down in its entirety.  *See Atlanta Bread Co.*, 663 S.E.2d at 748.  However, the new Georgia statutes permit non-disclosure provisions concerning trade secrets or confidential information to be

---

18      The Court stresses that it is not holding that attorneys' fees are awardable in this case.  The Stock Award Agreements expressly provide: "each party shall pay its own legal fees and other expenses associated with any dispute under this Agreement or any Exhibit hereto." (Docs. # 67-2 at 14; 67-3 at 14).  Although Plaintiffs claim that there is an attorneys' fee provision in the Ethics Agreements, the Court has determined that the Ethics Agreements cannot support Plaintiffs' breach of contract claims, nor do they permit an avenue for potential attorneys' fees.  *See supra* note 11 and accompanying text.

unlimited in time.  GA. CODE ANN. § 13-8-53(e) ("Nothing in this article shall be construed to limit the period of time for which a party may agree to maintain information as confidential or as a trade secret, or to limit the geographic area within which such information must be kept confidential or as a trade secret, for so long as the information or material remains confidential or a trade secret.").  Thus, non-disclosure provisions can continue indefinitely, as long as the information remains confidential or continues to be a trade secret.  *Id.*

However, non-disclosure provisions must still be reasonable in their operation.  "The validity of a non-disclosure provision depends upon its reasonableness," which requires two things: "(1) whether the employer is attempting to protect confidential information relating to the business, such as trade secrets, methods of operation, names of customers, personnel data, and so on; and (2) whether the restraint is reasonably related to the protection of the information."  *Holland Ins. Grp., LLC v. Senior Life Ins. Co.*, 766 S.E.2d 187, 192 (Ga. Ct. App. 2014) (internal citations omitted).

In its Summary Judgment Order, the Court determined that the non-disclosure provision was overbroad and unenforceable because Plaintiffs failed to put a time limit on the non-disclosure of confidential information.  (Doc. # 202 at 23-27).  Thus, Defendants were entitled to summary judgment on Count Three of Plaintiffs' Complaint, which alleged breach of contract based on that provision.  *Id.*

In their Motion for Reconsideration, Plaintiffs cite to the recent change in law and request that the Court amend its Summary Judgment Order and hold that the non-disclosure provision is enforceable as written.  (Doc. # 206-1 at 4-5).  In response, Defendants argue that the non-disclosure provision violates settled Georgia law, claiming

that the statute does not expressly overturn pre-2011 Georgia case law, unlike other sections of the statute. (Doc. # 219 at 16-17). Defendants' argument is meritless. While the reasonableness requirement remains, neither party has claimed the non-disclosure provision is unreasonable. Because § 13-8-53(e) clearly intended to remove the duration requirements for non-disclosure provisions, prior Georgia case law has been superseded by statute and the Court's prior holding constitutes a clear error of law.

### a.    Genuine Issues of Material Fact Exist

Because the Court has reconsidered its Summary Judgment Order at Plaintiffs' request, and determined that the non-disclosure provision is enforceable as written, the merits of Defendants' Motion for Summary Judgment (Doc. # 120) must be addressed. As with the non-competition claim, Plaintiffs must prove two essential elements for their breach of contract claim based on the non-disclosure provision: "the breach and the resultant damages." *Budget Rent-a-Car of Atl.*, 469 S.E.2d at 713.

### i.    Breach

In their Motion for Summary Judgment, the Individual Defendants claim that the evidence in the record "establishes that none of the Acuity ... electronic information has ever been utilized by Bickley or Robinson — let alone disclosed to [Big Ass Fans]." (Doc. # 120-1 at 31) (arguing on both the non-disclosure provision and KUTSA claims). Plaintiffs, however, claim that there is a factual dispute regarding whether Bickley or Robinson used or shared Acuity's confidential information and/or trade secrets with Big Ass Fans. (Doc. # 168 at 49-50). In support of that claim, Plaintiffs allege:

> Almost immediately after hiring Bickley, [Big Ass Fans] began developing its own lighting division; and it utilized Bickley as a valuable resource in this undertaking, as well as in the promotion of its signature High Bay light. Only

> one week after Bickley arrived at the company, [Big Ass Fans'] Lighting Development Team invited Bickley to a meeting entitled "Discussion of lighting segmentation within industrial market (HB LED lighting) and *discussion of Acuity's lighting roadmap*." Robinson's advice and insight was also regularly sought by [Big Ass Fans'] lighting team as it brought its High Bay to market.

(Doc. # 168 at 49). It is undisputed that Bickley retained a flash drive with information Acuity claims is proprietary and that Robinson downloaded the contents of his laptop, which contained proprietary information, to an external hard drive. (Docs. # 222-6 and 168-2 at 45-46). Accordingly, as this Court held with regard to the KUTSA claim in its prior Order, "a reasonable juror could conclude, based on the timing between the retention and alleged access of these documents and the launch of the Big Ass High Bay LED, that there is a causal connection between the alleged breach and Plaintiffs' damages." (Doc. # 202 at 37). Therefore, there are genuine issues of material fact that are best left to a jury.

### ii.    Damages

Where a non-disclosure agreement is breached, the standard of damages is the same as in the non-compete context. *Direct Response Prod., Inc.*, 2013 WL 5890473, at *4. Thus, the recoverable damages "are lost profits as well as the loss of customers, the loss of employees, and the decreased value of the business property purchased in reliance on the covenant." *Id.* (internal citations and quotation marks omitted). But, in the non-disclosure context, "when an employee wrongfully profits from the use of information wrongfully obtained from his employer, damages also may be measured by the employee's unjust gain derived from the unlawful use." *Id.* However, the damages must be causally-connected to the alleged breach and the amount of damages sought cannot be based on speculation. *Id.*

41

There is significant disagreement between the parties regarding damages.  In particular, Plaintiffs suggest that they are entitled to damages for the unlawful retention, disclosure, and utilization of Acuity's confidential information and trade secrets, which can be measured by the actual costs incurred by Acuity to develop their IBL product.  This damages debate is the subject of the Individual Defendants' Motion for Reconsideration (Doc. # 209) and their Renewed Rule 37 Motion to Exclude. (Doc. # 210). Those motions will be addressed later in this Memorandum Opinion and Order.

Regardless of the outcome of the parties' other arguments regarding the types of damages that can be alleged, and the evidence available to support those claims, Plaintiffs' claim for breach of contract based on the non-disclosure provision cannot be dismissed because of a lack of actual damages.  In Georgia, an injured party has a right to nominal damages, even if there has been no actual damage caused by the breach of contract. *Botterbusch*, 609 S.E.2d at 146-47.  Therefore, Plaintiffs may recover nominal damages. Accordingly, Plaintiffs' Motion for Reconsideration (Doc. # 206) is **granted** and the Individual Defendants' Motion for Summary Judgment (Doc. # 120) is **denied** with respect to Count Three of Plaintiffs' Complaint, alleging breach of contract based on the non-disclosure provision.

### 5.    Non-Solicitation Provisions

In the Summary Judgment Order, the Court stated generally that there was "nothing patently overbroad about the clauses relating to the non-solicitation of customers, employees, and agents," but the provisions could not be enforced because Georgia did not employ the "blue pencil" doctrine.  (Doc. # 202 at 30).  However, as discussed above, the Georgia legislature recently changed course and the "blue pencil" rule now applies to

42

employment contracts. GA. CODE ANN. § 13-8-53(d). Therefore, the failure to address the enforceability of the non-solicitation provision for that reason constitutes a clear error of law.

The new Georgia statutes provide guidance on how to structure non-solicitation provisions. Although there is a duration requirement, non-solicitation provisions are not required to expressly state a geographical area or describe the types of products or services considered to be competitive in order for the restraint to be enforceable. GA. CODE ANN. §§ 13-8-53(b); 13-8-57(b) (establishing two-year rebuttable presumption of reasonableness); *see also LifeBrite Lab.*, 2016 WL 7840217, at *5. Rather, Georgia law explicitly instructs courts that "[a]ny reference to a prohibition against 'soliciting or attempting to solicit business from customers' or similar language shall be adequate for such purpose." *LifeBrite Lab.*, 2016 WL 7840217, at *5 (citing GA. CODE ANN. §§ 13-8-53(b)). Non-solicitation clauses can also prohibit solicitation of the former employer's employees. *See e.g.*, *Carson*, 734 S.E.2d at 482.

There are two non-solicitation clauses in the Stock Award Agreements. One prohibits solicitation of Acuity's customers:

> Grantee acknowledges and agrees that during his/her employment, and for twenty-four (24) months after the Date of Termination, Grantee has not and will not directly or indirectly solicit Customers ... with whom he/she had Material Contact ... for the purpose of providing goods and/or services competitive with the Company's Business.

(Docs. # 67-2 at 12 and 67-3 at 12). The other prohibits solicitation of Acuity's employees and agents:

> Grantee acknowledges and agrees that during his/her employment, and for a period of twenty-four (24) months after the Date of Termination, Grantee has not and will not, directly or indirectly, whether on behalf of the Grantee

43

or others, solicit, lure or attempt to hire away any of the Company's employees or agents.

(Docs. # 67-2 at 12 and 67-3 at 12).  Here, the Defendants have not contested the enforceability of the non-solicitation position.  And if they had, those arguments would have been futile.  The non-solicitation provisions satisfy the duration, material contact, and competitiveness requirements, and the Court finds that the non-solicitation provisions are enforceable.

### a.    Genuine Issues of Material Fact Exist

Because the Court has reconsidered its Summary Judgment Order at Plaintiffs' request, and determined that the non-solicitation provisions are enforceable as written, the Court must consider the merits of Defendants' Motion for Summary Judgment. (Doc. # 120).  The Court will address the two essential elements for Plaintiffs' breach of contract claim based on the non-solicitation provision: breach and the resultant damages, in turn.

### i.    Breach

Plaintiffs have alleged two distinct violations of the non-solicitation provision.  First, Plaintiffs allege that the Individual Defendants solicited Acuity's independent sales agents. (Doc. # 67 at 18-20).  In addition, Plaintiffs claim that the Individual Defendants solicited Acuity's employees.  *Id.*

### (1)    Solicitation of Acuity's Agents

Georgia law "provides that ... restrictive covenants can only limit the ability of a former employee to *solicit* customers of the former employee."  *DJR Assoc., LLC v. Hammonds*, No. 2:16-cv-1729-TMP, 2017 WL 958148, at *15 (N.D. Ala. Mar. 13, 2017) (applying Georgia law and citing GA. CODE ANN. § 13-8-53).  A restrictive covenant "may

not validly preclude the employee from accepting unsolicited business from customers of his former employer." *Vulcan Steel Structures, Inc. v. McCarty*, 764 S.E.2d 458, 460 (Ga. Ct. App. 2014).  Accordingly, a former "employee is allowed to accept business and sell goods and services to the former employee's customers if the employee does not solicit the business and the customers approach him." *DJR Assoc., LLC*, 2017 WL 958148, at *15.

Plaintiffs claim that two of Acuity's agents – "Spectrum Lighting in Texas (Bickley's former region) and KA Lighting in Chicago (Robinson's former region) – provided sworn testimony that Bickley and Robinson solicited them not only to sell [Big Ass Fans'] fans, but also [Big Ass Fans'] High Bay LED, in direct competition with" Acuity.  (Doc. # 168 at 36). Defendants dispute this, claiming that there is no evidence to support the claim for solicitation of Acuity's agents.  (Doc. # 120-1 at 23).  Specifically, Defendants argue that "even if these alleged solicitations had resulted in any sales by Acuity ... agents of [Big Ass Fans'] lights, which they did not, any such relationship that might have formed between [Big Ass Fans] and these independent – and non exclusive – Acuity ... sales agents would not have resulted in a termination of the agent's relationship with Acuity."  *Id.* at 23-24. Because the Defendants liken these "independent sales agents" to employees, the Defendants argue that the covenant prohibits Bickley and Robinson from attempting to "solicit, lure or ... hire away" those agents, and neither Bickley nor Robinson are "alleged to have tried to do this."  *Id.* at 24.  To hold otherwise would convert the non-solicitation provision into a provision prohibiting any communication regarding employment opportunities.  Such a provision would be overbroad and unreasonable, and it is not what Acuity's non-solicitation provision prohibits.

45

In response, Plaintiffs counter that Acuity's sales agents are protected under the non-solicitation of employees *and* the non-solicitation of customers provisions. (Doc. # 168 at 36, n.40). Therefore, Plaintiffs claim that the Individual Defendants' argument that no Acuity sales agents were actually lured away by Robinson and Bickley is irrelevant, because the Stock Award Agreement "prohibits both the outright loss of agent relationship as well as agent engagement in competitive activity." (Docs. # 168 at 36; 225 at 10). The Defendants do not directly dispute whether Acuity's agents receive protection under the non-solicitation provision, but point to evidence in the record establishing that Big Ass Fans did not sell any of its lights through any of Acuity's agents. (Doc.# 182 at 10, n.10).

The Individual Defendants have not disputed Plaintiffs' characterization of Bickley's and Robinson's interactions with Spectrum Lighting and KA Lighting. Rather, the Defendants claim that Plaintiffs have not suffered damages. (Doc. # 182 at 10). Accordingly, Plaintiffs have sufficiently alleged that Bickley and Robinson breached the non-solicitation of customers provision by soliciting two of Acuity's agents.

### (2)    Solicitation of Acuity's Employees

In response to Plaintiffs' Motion for Reconsideration, the Individual Defendants claim that the record demonstrates no violation of the non-solicitation provision. (Doc. # 219 at 14-16). Specifically, the Defendants argue that the "plain terms of the covenant restrict only attempts to solicit Plaintiffs' employees" and that no solicitation occurred. *Id.* at 15. Because Bickley and Robinson did not initiate contact with any of Acuity's employees, Defendants claim they simply responded to contact initiated by Acuity employees, which is not prohibited. *Id.* Thus, Defendants argue, there is no genuine issue of material fact and the Court should conclude that Plaintiffs' claim for breach of the non-solicitation

46

provision fails as a matter of law. *Id.* at 16. Plaintiffs argue that there is no "*per se* rule that solicitation cannot occur where an employee or customer first initiates contact with a former employee." (Doc. # 168 at 29). Accordingly, the meaning of "solicitation" is critical in determining whether Defendants breached the non-solicitation provision with regards to Acuity's employees.

Georgia courts have exhaustively considered what constitutes solicitation. Relying on the definition of "solicit" in Webster's, the Georgia Court of Appeals found that to solicit someone is "to entreat, importune ... to endeavor to obtain by asking or pleading ... to urge." *Akron Pest Control v. Radar Exterminating Co.*, 455 S.E.2d 601, 602 (Ga. Ct. App. 1995) (citing *Mgt. Compensation Grp. v. United Security Employee Programs*, 389 S.E.2d 525 (Ga. Ct. App. 1989)). Solicit "has been otherwise defined as: 'To appeal for something; to apply to for obtaining something; to ask earnestly; to ask for the purpose of receiving; to endeavor to obtain by asking or pleading; to entreat, implore, or importune; to make petition to; to plead for; to try to obtain; and though the word implies a serious request, it requires no particular degree of importunity, entreaty, imploration, or supplication.'" *Id.* at 602-03 (internal citations and quotation marks omitted). Even "indirect solicitation" requires the former employee to "undertake[ ] some affirmative action on his part." *Sascha Food Servs. of Atl., Inc. v. Chump*, 484 S.E.2d 323, 326 (Ga. Ct. App. 1997) (internal citations omitted).

"Surely one does not solicit someone by merely having a conversation." *LifeBrite Lab.*, 2016 WL 7840217, at *8 (holding that former employee's conversation informing clients that she was no longer going to be working for her former employer did not constitute solicitation). "To solicit is to use some sort of salesmanship, to encourage and

persuade another to do something." *Id.*

In the customer context, courts have refused to find solicitation where the client or customer approaches the former employee without prior solicitation and the former employee accepts that business. *Akron Pest Control*, 455 S.E.2d 601. "Merely *accepting* business ... does not in any sense constitute a solicitation of that business." *Id.* at 603. Neither does making a sales pitch "after the customer initiated contact and requested the pitch." *Gen. Assur. of America, Inc. v. Overby-Seawell Co.*, 893 F. Supp. 2d 761, 775 (E.D. Va. 2012) (applying Georgia law).

Georgia courts have adopted a similar rule regarding solicitation of employees and have held that there is no solicitation or inducement when the allegedly-solicited employee is the one who initiated contact. *Wachovia Ins. Servs., Inc. v. Fallon*, 682 S.E.2d 657, 662 (Ga. Ct. App. 2009); *see also Wolff v. Protégé Sys., Inc.*, 506 S.E.2d 429 (Ga. Ct. App. 1998), *overruled on "blue pencil"/severability grounds by Advance Tech. Consultants, Inc.*, 551 S.E.2d at 737. Therefore, merely responding to an inquiry regarding employment does not constitute solicitation. Likewise, discussing, even enthusiastically, employment opportunities after being contacted by a company's employee does not violate a non-solicitation provision.

The evidence in the record is clear that Robinson initiated contact with Bickley concerning employment opportunities at Big Ass Fans. (Doc. # 168-2 at 16-20). Similarly, Dantzler initiated contact with Bickley about possible employment opportunities with Big Ass Fans in the Dallas area. (Doc. # 168-6 at 14). However, the record establishes that Bickley contacted Jonathan Archer twice about employment opportunities with Big Ass

48

Fans.  (Doc. # 168-13 at 4, 7).[19]  Although Archer was never hired by Big Ass Fans, the non-solicitation provision prohibits attempted solicitation of Acuity's employees.  (Doc. # 67-2 at 12).  Therefore, a genuine issue of material fact exists as to whether there was a breach of the non-solicitation of employees provision.

### ii.    Damages

In their Motion for Summary Judgment, the Individual Defendants also argued that the Plaintiffs have not demonstrated that Bickley's or Robinson's actions were the proximate cause of any damages Plaintiffs claim to have suffered.  (Doc. # 120-1 at 20-21).  Furthermore, even apart from the issue of causation, the Individual Defendants claimed that the Plaintiffs cannot present admissible evidence of damages in support of their solicitation claim.  *Id.* at 21-23.

Plaintiffs contest the characterization of their damages.  Because Plaintiffs argued that Bickley's conduct caused Robinson's departure and "Bickley's and Robinson's conduct caused ... Dantzler to leave [Acuity]," Plaintiffs claim that they "may recover damages caused by their departure."  (Doc. # 168 at 35).  Specifically, Plaintiffs claim that their damages "include: (1) the costs of interviewing and hiring Robinson's and Dantzler's replacements; (2) the costs of diverting existing employees from the field to assume their responsibilities; and (3) the sales decline in Robinson's region during the quarter following his departure from [Acuity]."  *Id.*

---

19    The record is unclear with respect to another Acuity employee, John Kirkhoff.  In his deposition, Kirkhoff testified that he could not recall if it was he or Bickley who initiated communication about employment opportunities with Big Ass Fans. (Doc. # 168-12 at 9-12).

First, the Court has determined that there is no solicitation claim based on either Robinson's or Dantzler's departures, because both men initiated contact with Bickley about employment opportunities with Big Ass Fans. Moreover, even if the Court had not reached that conclusion, the evidence of these damages has been excluded by prior Order of the Court. On the same day the Court entered the Summary Judgment Order, the Court entered another Order ("the Damages Order") (Doc. # 201). In that Order, the Court adopted Magistrate Judge Wier's recommendation that the Court exclude Plaintiffs' evidence of lost profits attributable to Robinson's and Dantzler's departures and the costs of replacing Robinson and Dantzler, as well as evidence of other damages, for failure to comply with Federal Rule of Civil Procedure 26. (Doc. # 201 at 1).

Therefore, Plaintiffs now argue that their "lack of actual damage as a result of Bickley's and Robinson's unlawful solicitation does not doom Plaintiffs' claim, as [they] are still entitled to nominal damages under Georgia law." (Doc. # 219 at 10). Plaintiffs are correct. Because Georgia law grants an injured party the right to damages in every breach of contract case, even "if there has been no actual damage, the injured party may recover nominal damages." *Botterbusch*, 609 S.E.2d at 146-47. Therefore, although only nominal damages are possible, the Individual Defendants are not entitled to summary judgment on Count One of Plaintiffs' Complaint, which alleges breach of contract based on the non-solicitation provisions. Accordingly, Plaintiffs' Motion for Reconsideration (Doc. # 206) is **granted** and the Individual Defendants' Motion for Summary Judgment (Doc. # 120) is **denied** with respect to that claim.

### 6. Tortious Interference Against Big Ass Fans

Plaintiffs sued Big Ass Fans for tortious interference with contractual relations,

claiming that Big Ass Fans intentionally and improperly interfered with respect to Bickley's non-competition provision and both Bickley and Robinson's non-solicitation provisions. (Doc. # 67 at 33-37). Big Ass Fans moved for summary judgment on Plaintiffs' tortious interference claim. (Doc. # 121). Their Motion for Summary Judgment is a mirror image of the Individual Defendants' Motion (Doc. # 120), but for the addition of arguments that Big Ass Fans did not have knowledge of, or intent to interfere with, the restrictive covenants. (Doc. # 121 at 20-21, 31-33). In its Summary Judgment Order, the Court held that Plaintiffs could not sustain their claim against Big Ass Fans for tortious interference with contractual relations because it had "already found" that the non-competition and non-solicitation provisions were "overly broad and unenforceable." (Doc. # 202 at 34).

Accordingly, in their Motion for Reconsideration, Plaintiffs ask the Court to reinstate their tortious interference claim against Big Ass Fans because those restrictive covenants are enforceable, either as written or as modified. (Doc. # 206-1 at 2). In response, Big Ass Fans argues that regardless of whether the Court finds the restrictive covenants enforceable, summary judgment in Big Ass Fans' favor is still warranted for two reasons: (1) Plaintiffs have presented no evidence to support a finding that Big Ass Fans knew of and intended to interfere with the covenants, and (2) Plaintiffs have presented no admissible proof of damages. (Doc. # 218 at 2). These are the very arguments that Big Ass Fans advanced in support of their Motion for Summary Judgment. (Doc. # 121). Plaintiffs continue to claim, as they did at the summary judgment stage, that those arguments do not warrant dismissal of the tortious interference claim. (Doc. # 225 at 12).

Tortious interference with a contract requires a plaintiff to prove the following elements: "(1) the existence of a contract; (2) [the defendant's] knowledge of the contract;

51

(3) that [defendant] intended to cause a breach of that contract; (4) that [defendant's] actions did indeed cause a breach; (5) that damages resulted to [the plaintiff]; and (6) that [the defendant] had no privilege or justification to excuse its conduct. *Snow Pallet, Inc. v. Monticello Banking Co.*, 367 S.W.3d 1, 5-6 (Ky. Ct. App. 2012) (citing *Ventas, Inc. v. Health Care Prop. Investors, Inc.*, 635 F. Supp. 2d 612, 619 (W.D. Ky. 2009)). Big Ass Fans' arguments relate to three of these elements: knowledge of the contract, intent to cause breach, and damages. The Court will first address the contract elements, and then turn to the existence of damages.

### a.      Knowledge of and Intent to Cause Breach

### i.      The Non-Solicitation Provisions

Plaintiffs claim they "presented substantial evidence of [Big Ass Fans'] knowledge of its covenants with Bickley and Robinson, as well as its intent to interfere with them." (Doc. # 225 at 12). As to knowledge of the non-solicitation provision, Plaintiffs highlight evidence proving that Big Ass Fans knew of Bickley's restrictive covenants. In his depositions, Bickley testified that he told Big Ass Fans' Director of Human Resources about his restrictive covenants or gave them a copy of the Stock Award Agreement. (Docs. # 168-7 at 13, 47 and 168-8 at 97). Moreover, Plaintiffs claim that Big Ass Fans acknowledged awareness of Bickley's restrictive covenants on May 28, 2013, when they responded to Acuity's cease-and-desist letter. (Docs. # 168 at 53 and 168-1 at Ex. 26). Accordingly, Plaintiffs argue that, at the least, there is a "dispute of fact as to the scope of [Big Ass Fans'] knowledge when it hired Bickley and then encouraged and facilitated" his breaches. (Doc. # 168 at 53). Plaintiffs also assert that it is "undisputed that [Big Ass Fans] knew Robinson had identical covenants with [Acuity]." *Id.* at 54. "Notwithstanding

this knowledge, [Big Ass Fans] allowed and – indeed, encouraged – Bickley's and Robinson's involvement in the recruitment of Jay Dantzler thereafter, as well as Bickley's attempted recruitment of Jon Archer." *Id.* Thus, Plaintiffs claim, there is sufficient proof of Big Ass Fans' knowledge of and intent to cause breach of the non-solicitation provisions.

### ii.     The Non-Competition Provision

Plaintiffs rely on the same evidence offered for the non-solicitation provision as proof that Big Ass Fans knew of Bickley's restrictive covenant prohibiting competition. Additionally, Plaintiffs claim that Big Ass Fans' admission that it "intentionally placed Bickley in charge of lighting sales personnel at [Big Ass Fans] prior to the expiration of his one-year non-compete" is sufficient proof of Big Ass Fans' intent to cause breach of the non-competition provision.  (Doc. 168 at 55).

### iii.    Genuine Issues of Material Fact Exist

The Court has held that there is no claim based on Bickley's alleged solicitation of Robinson or Dantzler, because both Robinson and Dantzler initiated the conversation regarding employment opportunities. *See infra*, at 48-49.  However, Plaintiffs do have a viable claim based on the alleged attempted solicitation of Archer, as well as the attempted solicitation of two Acuity agents.  Whether the Individual Defendants' conduct violated the non-solicitation provision is a question which must be resolved by the jury.  In regards to the non-competition provision, the Court has also determined that genuine issues of material fact exist concerning whether the Individual Defendants breached that covenant. Based on Big Ass Fans' alleged knowledge of the restrictive covenants, and the actions taken thereafter, Plaintiffs have succeeded in setting forth specific facts showing that there is a genuine issue for trial regarding whether Big Ass Fans tortiously interfered with the

non-solicitation or non-competition provisions.   Therefore, neither of these arguments warrant summary judgment in Big Ass Fans' favor.

### b.    Damages

#### i.    Non-Solicitation Provision

Defendants point to the Court's Damages Order (Doc. # 201), which "struck the bulk of Plaintiffs' damages claims, including each and every item of damages alleged by Plaintiffs on their no-solicit claims," and argue that it "plainly compels ... the dismissal of Plaintiffs' claim against [Big Ass Fans] for interference with the no-solicit covenant[s]" in the Stock Award Agreements.  (Doc. # 218 at 2-3).  Plaintiffs concede that they are "barred from establishing actual damages associated with [Big Ass Fans'] interference with the non-solicitation covenants," but maintain that their tortious interference claim survives because "punitive and nominal damages are still awardable."  (Doc. # 225 at 16).

#### ii.    Non-Competition Provision

Plaintiffs argue that they "presented evidence of damages associated with Bickley's violation of (and, in turn, [Big Ass Fans'] interference with) Bickley's non-competition covenant."  (Doc. # 225 at 13).  As discussed in detail above, Plaintiffs rely on the costs of developing their IBL product to quantify the unfair advantage Big Ass Fans gained "in bringing its own high bay LED to market."  *Id.*

After careful examination of this claim of damages against the Individual Defendants, the Court concluded that these "claimed damages cannot be traced to Bickley's alleged breach of the non-competition provision."  *Supra* at 37-38 (citing *Webster*, 303 S.E.2d at 522; *Direct Response Prod., Inc.*, 2013 WL 5890473, at *4).  The Court also held that this attenuated damages claim was "an obvious attempt to clear the evidentiary hurdle created

by the Court's prior rulings (Docs. # 93 and 201), which prevented Plaintiffs from discovering Big Ass Fans' profits related to the sale of its lighting products and excluded other evidence of damages for violation of the discovery rules." *Id.*

Interestingly, Plaintiffs claim that "[Big Ass Fans'] attempt to apply Magistrate Wier's prior discovery ruling denying Plaintiffs' motion to compel production of [Big Ass Fans'] profits on the sale of the [Big Ass Fans'] High Bay ... is unavailing" because that "ruling related to the scope of available damages under Plaintiffs' KUTSA claim, a claim filed only against Bickley and Robinson, not [Big Ass Fans]." *Id.* at 14. Thus, Plaintiffs argue that they "are entitled to seek damages measured by the benefit [Big Ass Fans] obtained by virtue of its tortious interference." *Id.* at 15.

As the Court held with regard to the Individual Defendants, Plaintiffs' attempt to seek damages for Big Ass Fans' allegedly unfair benefit, quantified by the cost of bringing their IBL product to market, "is nothing more than a reverse engineering of the arguments Plaintiffs made, and Magistrate Judge Wier rejected, when they sought documents related to Big Ass Fans' lighting sales profits." *Supra* at 37. The Court, once again, holds that "Plaintiffs' unjust enrichment theory of damages, which claims that Big Ass Fans gained an unfair advantage in bringing its own high bay LED light to market, is only theoretically available under the KUTSA claim, not Plaintiffs' claim for breach of the non-compete." *Supra* at 37 (citing (Doc. # 93)). Plaintiffs sued Big Ass Fans for tortious interference, *not* under KUTSA; therefore, "[Big Ass Fans'] potential liabilities are standard tort damages," which does not include unjust enrichment. (Doc. # 93 at 4) (citing *Harrodsburg Indus. Warehousing, Inc. v. MIGS, LLC*, 182 S.W.2d 529, 533-34 (Ky. Ct. App. 2005) (additional citations omitted)).

### iii.      Nominal and Punitive Damages

In a last-ditch effort to save its tortious interference claim against Big Ass Fans, Plaintiffs argue that "[e]ven in the absence of actual damages" for the non-competition or non-solicitation provisions, their "tortious interference claim survives under Kentucky law, [because] both nominal and punitive damages remain awardable."  (Doc. # 225 at 15-16).

In Kentucky, "generally ... where a litigant establishes a cause of action but has not established an entitlement to compensatory damages, nominal damages may be awarded." *Mo-Jack Distrib., LLC v. Tamarak Snacks, LLC*, 476 S.W.3d 900, 907 (Ky. Ct. App. 2015) (citing *Stoll Oil Ref. Co. v. Pierce*, 343 S.W.2d 810, 811 (Ky. 1961)).  The Court has been unable to locate authority expressly permitting nominal damages for tortious interference with a contract.  Typically, in tortious interference claims, "the plaintiff bears the burden of proving ... that the plaintiff actually suffered damages as a result of the defendant's actions."  *In re Davis*, 334 B.R. 874, 886 (Bkrtcy. W.D. Ky. 2005), *reversed in part on other grounds*, 347 B.R. 607 (W.D. Ky. 2006).

Nevertheless, Kentucky courts are generous with respect to nominal damages.  *See* Kentucky Handbook Series, Kentucky Law of Damages, § 3:2 (Mar. 2017).  Specifically, Kentucky Courts have awarded nominal damages in traditional breach of contract claims (which require proof of damages as an element), and breach of non-competition clauses where no loss of business is shown, as well as for interference with property rights.  *Id.* (citing *Harness v. Kentucky Fluor Spar Co.*, 147 S.W. 934, 940 (Ky. 1912); *Diers v. Edwards*, 63 S.W. 246, 277 (Ky. 1901); *Nortonville Coal Co. v. Sisk*, 139 S.W. 1086 (Ky. 1911); *USACO Coal Co. v. Liberty Nat. Bank & Trust Co. of Louisville*, 700 S.W.2d 69 (Ky. Ct. App. 1985); *Jean v. Brentlinger*, 159 S.W. 1139, 1140 (1913)).  Accordingly, following

the Kentucky courts' lead, the Court concludes that in the absence of actual damages, nominal damages are awardable for tortious interference with a contract.

Because nominal damages are possible on Plaintiffs' tortious interference claim, Plaintiffs may be able to establish that they are entitled to punitive damages as well. "The rule that punitive damages may be awarded even when a nominal amount is awarded as damages was established early in [Kentucky] jurisprudence." *Mo-Jack Distrib., LLC*, 476 S.W.3d at 907 (citing *Louisville & N.R. Co. v. Ritchel*, 147 S.W. 411 (Ky. 1912)). The Kentucky Supreme Court has reiterated this rule in recent years. *See Commonwealth v. Vinson*, 30 S.W.3d 162, 166 (Ky. 2000) ("Where the plaintiff has suffered an injury for which compensatory damages, though nominal in amount may be awarded, the jury may in a proper case, award punitive damages as well."); *see also Roberie v. VonBokern*, No. 2004-SC-00250-DG, 2006 WL 2454647, at *6 (Ky. Dec. 21, 2006).

However, the standard for punitive damages is high. Under Kentucky law, punitive damages are available if the plaintiff can prove by clear and convincing evidence that the defendant acted with oppression, fraud, or malice. Ky. Rev. Stat. Ann. § 411.184(2).[20] The parties have not specifically addressed the availability of punitive damages in their briefing; therefore, the Court is not holding that punitive damages are available, but simply stating that punitive damages are possible, even when a nominal amount of damages are awarded.

---

20    Although the Kentucky Supreme Court held Ky. Rev. Stat. Ann. § 411.184(1)(c) unconstitutional, it expressed "no opinion ... as to the constitutionality of [Ky. Rev. Stat. Ann.] § 411.184(2)." *Williams*, 972 S.W.2d 260, 268 (Ky. 1998). "In subsequent decisions, the Kentucky Supreme Court has ... applied other sections of the statute, specifically, [Ky. Rev. Stat. Ann. § 411.184(2)." *Anderson v. Wade*, 33 F. App'x 750, 758-59 (6th Cir. 2002).

Accordingly, Plaintiffs' claim against Big Ass Fans for tortious interference with Bickley's non-competition provision and Bickley's and Robinson's non-solicitation provisions cannot be dismissed. There are genuine issues of material fact that must be resolved by a jury and Plaintiffs' claim survives, despite the absence of actual damages. Therefore, Plaintiffs' Motion for Reconsideration (Doc. # 206) is **granted** with respect to their tortious interference claim against Big Ass Fans and Defendant Big Ass Fans' Motion for Summary Judgment (Doc. # 121) is **denied**.

### D.   *Defendants' Motion for Reconsideration and Renewed Rule 37 Motion*

The Individual Defendants have filed two inextricably intertwined motions regarding Plaintiffs' damages. One seeks reconsideration of the Court's Summary Judgment Order with respect to Plaintiffs' damages claims. (Doc. # 209). The other renews Defendants' Rule 37 Motion to Exclude certain evidence of Plaintiffs' alleged damages. (Doc. # 210). Although these pleadings are duplicative in several respects, the Court will consider the motions separately, turning first to the Renewed Rule 37 Motion and then to Defendants' Motion for Reconsideration.

### 1.   Relevant Prior Orders

It is worth noting that in a prior Order, this Court barred Plaintiffs from introducing certain evidence of damages. (Doc. # 201). In the Damages Order, entered the same day as the Summary Judgment Order, the Court adopted Magistrate Judge Wier's recommendation (Doc. # 191) that the Court exclude Plaintiffs' evidence of: (1) lost profits attributable to Robinson's and Dantzler's departures, (2) costs of replacing Robinson and Dantzler, and (3) costs of obtaining a forensic computer evaluation for failure to comply with Federal Rule of Civil Procedure 26. (Doc. # 201 at 1). With respect to the other damages

evidence Defendants sought to exclude, the Court held that the Defendants' Motion to Exclude should be denied due to inadequate briefing. *Id.* at 2. In their Renewed Rule 37 Motion, the Defendants have attempted to "more clearly set forth why those [damages claims] should be stricken." (Doc. # 210 at 2).

These very same damages claims were also part of Defendants' Motion for Summary Judgment. (Doc. # 120). Consistent with its Damages Order, the Court held:

> Defendants have raised this issue once before, in briefing their Motion to Exclude (Doc. # 107). However, Judge Wier declined to exclude these particular items of damages due to insufficient briefing on the issue. Because the briefing is similarly inadequate in Defendants' Motion for Summary Judgment, the Court finds that summary judgment is inappropriate at this juncture.

(Doc. # 202 at 32).

### 2.    Renewed Rule 37 Motion to Exclude

The Individual Defendants renew their Rule 37 Motion to Exclude and ask the Court to bar Plaintiffs from introducing any evidence regarding four of Plaintiffs' damages claims. (Doc. # 210). Specifically, the Defendants claim that Plaintiffs made inadequate disclosures and/or have abandoned the following damages claims: "(1) lost profits arising out of the alleged sale of [Big Ass Fans'] High Bay LED product through [Acuity's] agents, (2) dilution and/or devaluation of Plaintiffs' share of the lighting market, (3) lost profits resulting from Defendants' alleged misappropriation of Plaintiffs' proprietary data, and (4) cost savings accrued by [Big Ass Fans] as a result of its alleged use of that data." *Id.* at 1.

Plaintiffs have "concede[d] that they are no longer seeking damages" associated with  dilution and/or devaluation, lost profits resulting from [Big Ass Fans'] alleged use of

59

their proprietary data, or lost profits arising out of the alleged sale of the High Bay LED through Acuity's agents.  (Docs. # 220 at 2 and 168 at 36).  Thus, the only disputed damages for purposes of the Defendants' Renewed Rule 37 Motion are the "cost savings accrued" by Big Ass Fans as a result of its alleged "misappropriation and use of [Acuity's proprietary] data."  (Doc. # 220 at 2).

### a.    Rule 37 Standard

Federal Rule of Civil Procedure 26(a)(1)(A)(iii) requires parties to disclose "a computation of each category of damages claimed," and make available "the documents or other evidentiary material ... on which each computation is based, including materials bearing on the nature and extent of the injuries suffered."  This duty continues throughout discovery.  A "party who has made a disclosure under Rule 26(a) ... must supplement or correct its disclosure ... in a timely manner if the party learns that in some material respect the disclosure ... is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process."  FED. R. CIV. P. 26(e)(1)(A).  Failure to comply with these rules can carry significant consequences.

Pursuant to Rule 37, "[i]f a party fails to provide information ... as required by Rule 26(a) or (e), the party is not allowed to use that information ... to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  FED. R. CIV. P. 37(c)(1).  The test for Rule 37(c) exclusion "is very simple: the sanction is mandatory unless there is a reasonable explanation of why Rule 26 was not complied with or the mistake was harmless."  *Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transp.*, 596 F.3d 357, 370 (6th Cir. 2010) (quoting *Vance ex rel Hammons v.*

60

*United States*, 182 F.3d 920 (6th Cir. 1999)).  Therefore, the "exclusion of non-disclosed evidence is automatic and mandatory under Rule 37(c)(1) unless non-disclosure was justified or harmless." *Dickenson v. Cardiac & Thoracic Surgery of E. Tenn.*, 388 F.3d 976, 983 (6th Cir. 2004).  Once a violation of Rule 26 has been shown, the burden to prove harmless or substantial justification is on the party to be sanctioned.

### b.    Cost Savings Accrued by Big Ass Fans

Although Plaintiffs concede that they are not seeking the majority of the damages the Individual Defendants have moved to exclude, the Plaintiffs argue that the cost savings accrued by Big Ass Fans as a result of the misappropriation and use of Plaintiffs' data is "fully recoverable" because it "overlaps with" Plaintiffs' claim for damages associated with the development of its IBL product.  (Docs. # 220 at 2).  Plaintiffs also contest Defendants' characterization that they "abandoned" this damages claim at any point in the litigation.  *Id.* at 8.  Rather, Plaintiffs claim that their damages claim for cost savings accrued by Big Ass Fans arose throughout the discovery process.  *Id.*  Specifically, Plaintiffs claim they: "identified this specific category of damages in their interrogatory responses" (Doc. # 220-1); designated a damages designee who testified that Plaintiffs sought damages associated with Big Ass Fans' ability to "leapfrog their position in the marketplace" through the use of Acuity's proprietary information (Doc. # 220-2); and produced a witness who testified that a company like Big Ass Fans, entering the market for the first time, could use the misappropriated information (Doc. # 220-3).  Thus, Plaintiffs argue that "[t]his testimony, combined with Plaintiffs' own evidence regarding its IBL costs, was more than sufficient to place Defendants on notice of Plaintiffs' intent to seek this measure of damages."  (Doc. # 220 at 9).

To the extent that Plaintiffs seek any "cost savings achieved by [Big Ass Fans] beyond" their alleged damages for the IBL development costs, Defendants accuse Plaintiffs of further "gamesmanship in holding back their damages theories until it was too late for Defendants to meaningfully address" them, a tactic which previously "led to the exclusion of Plaintiffs' evidence of lost profits, replacement costs, and forensic evaluation costs." (Doc. # 222 at 1) (citing Doc. # 191 at 11). Although Plaintiffs "listed 'any and all cost savings accrued by [Big Ass Fans] as a result of the misappropriation and use of Plaintiffs' data' as one of the numerous categories of damages that Plaintiffs might pursue, Plaintiffs made no attempt to quantify this category and offered no documents or other discovery that appeared to calculate any savings to [Big Ass Fans] or provide the basis for such a calculation." *Id.* at 4 (citing Doc. # 222-3 at 9-10). Moreover, Defendants argue that nothing in Chad Sheffield's deposition testimony changes the calculation. *Id.* at 5. Therefore, Defendants claim that "Plaintiffs' failure to quantify any damages beyond the $79,000 [IBL development costs] precludes them from presenting evidence of such damages at trial." *Id.* at 7.

The Court agrees with the Individual Defendants. In so far as the Plaintiffs seek any "cost savings accrued" by Big Ass Fans, beyond their quantification of such damages via their own IBL development costs, Plaintiffs are barred from introducing or relying on any such evidence of damages under Rule 37(c)(1). "[A] computation of each category of damages claimed" is expressly required by the Federal Rules of Civil Procedure. FED. R. CIV. P. 26(a)(1)(A)(iii). Therefore, broad disclosure of a category of damages sought is not sufficient to satisfy the initial disclosure requirement. *See Bessemer*, 596 F.3d at 367; *see also Poore v. Sterling Testing Sys., Inc.*, No. 6:04-cv-194-KKC, 2006 WL 273915, at *3

(E.D. Ky. Feb. 1, 2006).  The deposition testimony that Plaintiffs attempt to rely on does not resolve this problem.  The sole reference to Big Ass Fans' alleged "leapfrogging in the market place" in Chad Sheffield's deposition does not amount to meaningful testimony regarding "costs savings accrued" by Big Ass Fans.  (Doc. # 220-2 at 3).  Nor does Tony Gineris's abstract testimony that Acuity's proprietary information would be useful for a company entering the lighting business for the first time.  (Doc. # 220-3).

Thus, Plaintiffs failed to sufficiently place Defendants on notice of their intent to seek "cost savings accrued by [Big Ass Fans]," beyond their $79,000 IBL development costs.  Plaintiffs have not even attempted to provide a reasonable explanation or show that their mistake was harmless.  Accordingly, Plaintiffs are barred from introducing any evidence of such damages, and the Individual Defendants' Renewed Rule 37 Motion to Exclude is **granted** with respect to: (1) lost profits arising out of the alleged sale of Big Ass Fans' High Bay LED product through Acuity's agents, (2) dilution and/or devaluation of Plaintiffs' share of the lighting market, (3) lost profits resulting from Defendants' alleged misappropriation of Plaintiffs' proprietary data, and (4) any cost savings accrued by Big Ass Fans, beyond Plaintiffs' claim for their IBL development costs.

### 3.    Motion for Reconsideration

The Individual Defendants also seek reconsideration of the Court's Summary Judgment Order, claiming that the Court erred by not specifically addressing their arguments with respect to Plaintiffs' damages claims.  (Doc. # 209).

### a.    Standards of Review

The Individual Defendants vaguely move for reconsideration without citing any Federal Rule of Civil Procedure, aside from Rule 56, which addresses summary judgment

63

motions. (Doc. # 209). However, like the Plaintiffs, the Individual Defendants' Motion for Reconsideration was filed exactly 28 days after entry of the Court's Summary Judgment Order, and therefore, Federal Rule of Civil Procedure 59(e), which permits a party to move to alter or amend a judgment within 28 days of its entry, is the appropriate vehicle. Therefore, the Court will review Defendants' Motion for Reconsideration under Rule 59(e). *See Cockrel*, 270 F.3d at 1047.

"A court may grant a motion to alter or amend judgment only if there was '(1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice.'" *ACLU of Ky. v. McCreary Cty., Ky.*, 607 F.3d 439, 450 (6th Cir. 2010) (quoting *Intera Corp. v. Henderson*, 428 F.3d 605, 620 (6th Cir. 2005)). In their Motion for Reconsideration, the Individual Defendants claim that "the Court did not specifically address the merits" of their Motion for Summary Judgment on several of Plaintiffs' damages claims. (Doc. # 209-1 at 2). Accordingly, the Individual Defendants ask the Court to "address and grant [their] Motion for Summary Judgment as to ... the claim relating to the IBL development costs and the other damages claims abandoned by the Plaintiffs." *Id.* at 3.

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). If there is a dispute over facts that might affect the outcome of the case under governing law, then entry of summary judgment is precluded. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party has the ultimate burden of persuading the court that there are no disputed material facts and that he is entitled to judgment as a matter of law. *Id.*

64

## b.     Scope of Reconsideration

It is unclear what exactly the Defendants seek reconsideration of.  In their Motion for Reconsideration, Defendants cite to portions of their Motion for Summary Judgment, which raised damages arguments regarding the return-of-property covenant, as well as the trade secrets and confidentiality covenant (the non-disclosure provision).  (Doc. # 120-1 at 32-37).  But, Defendants appear to limit their request for reconsideration to the damages claims as they relate to the breach of the return-of-property provision and KUTSA claims, the sole surviving claims after entry of the Summary Judgment Order.  (Doc. # 202).  Plaintiffs' Response indicates they were left with a similar impression.  (Doc. # 220 at 3, 10).  Accordingly, the Court's reconsideration will be limited to these damages, as they relate to Plaintiffs' claims under KUTSA and the return-of-property provision, and *not* the non-disclosure provision.

## c.     Cost Savings Accrued by Big Ass Fans

The Court has barred Plaintiffs from introducing any evidence of alleged cost savings accrued by Big Ass Fans, beyond Plaintiffs' claim for their IBL development costs, pursuant to Rule 37 for failure to comply with Rule 26(a) and (e).  Accordingly, the Court need not address the parties' arguments regarding whether summary judgment is warranted for this damages claim.

## d.     Plaintiffs' IBL Development Costs

The Individual Defendants also take issue with Plaintiffs' alleged damages claim for the costs to develop their own IBL product.  (Doc. # 209-1 at 3-5).  The Defendants claim that Plaintiffs' IBL development costs do not "have any causal connection to any loss they claim to have suffered as a result of Bickley and/or Robinson's alleged misappropriation

of their proprietary information" because the IBL was developed before Bickley and Robinson left Acuity.  *Id.* at 3.  Furthermore, Defendants assert that "Plaintiffs have adduced no evidence that any IBL related information was even accessed by Bickley or Robinson."  *Id.* at 4.  Lastly, Defendants argue that even if Defendants' alleged use of Acuity's proprietary data "enabled [Big Ass Fans] to avoid having to incur development costs of a similar nature in launching its High Bay LED," Big Ass Fans' alleged benefit is "not a compensable item of recovery" against the Individual Defendants.  *Id.*  Because the IBL development costs are the only damages Plaintiffs claim in support of their KUTSA and return-of-property claims, the Defendants ask the Court to grant summary judgment in their favor on those claims.  (Doc. # 209 at 2)

Plaintiffs claim that the fact that they did not bring a KUTSA or return-of-property claim against Big Ass Fans does not preclude them from seeking these damages.  (Doc. # 220 at 3).  In support of that argument, Plaintiffs direct the Court's attention to the damages possible under KUTSA and claim that they may recover a "reasonable royalty." (Doc. # 220 at 3-7).  Alternatively, Plaintiffs argue that "[r]egardless of the availability of reasonable royalty damages on Plaintiffs' breach of contract and KUTSA claims, Plaintiffs are entitled" to nominal damages and exemplary damages; and therefore, these claims cannot be dismissed.  *Id.* at 9-10.

KUTSA provides civil remedies for misappropriation of trade secrets if the plaintiff can prove: (1)  that the information misappropriated qualifies as a trade secret and (2) that the defendant misappropriated such information.  Ky. Rev. Stat. Ann. § 365.892(2)(a)-(b).  A failure under either prong will result in dismissal of the claim as a matter of law.  *Auto Channel, Inc. v. Speedvision Network, LLC*, 144 F. Supp. 2d 784, 795 (W.D. Ky. 2001).

66

Business information, such as pricing and customer sales information, may constituted a protected trade secret under KUTSA if that information is not publicly known or otherwise ascertainable by proper means. *See e.g.*, *Fastenal Co. v. Crawford*, 609 F. Supp. 2d 650 (E.D. Ky. 2009). It is undisputed that Bickley's flash drive contained two pages of handwritten notes about a distributor. (Docs. # 222 at 12; 222-6 at 14-34). It is also undisputed that Robinson's external hard drive contained statistical compilations of the dollar sales for the IBL product. (Doc. # 222 at 12; Sealed Doc. # 224-1). As the Court previously held in its Summary Judgment Order, "a reasonable juror could conclude, based on the timing between the alleged access of these documents and the launch of the Big Ass High Bay LED, that there is a causal connection between the alleged breach and Plaintiffs' damages." (Doc. # 202 at 37).

KUTSA "replaces all conflicting civil state law regarding misappropriation of trade secrets except for those relating to contractual remedies." *Auto Channel, Inc.*, 144 F. Supp. at 788. KUTSA provides for three types of damages:

> Damages may include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss. In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret.

Ky. Rev. Stat. Ann. § 365.884(1).

"Damages in trade secrets cases are difficult to calculate, because the offending company has mixed the profits and savings from increased quality and quantity of products, as well as savings from reduced research and production, with its own natural profits." *Mid-Michigan Computer Sys., Inc. v. Marc Glassman, Inc.*, 416 F.3d 505, 510 (6th Cir. 2005)

(quoting *Avery Dennison Corp v. Four Pillars Enter. Co.*, 45 F. App'x 479, 485 (6th Cir. 2002). "When the misappropriated trade secret is used to field competing products, the best measure of damages is the plaintiff's lost profits or the defendant's illicit gains." *Id.* (quoting *Avery*, 45 F. App'x at 485). "However, where the misappropriated secrets were not directly used to field competing products, but were used ... to save research and manufacturing resources, plaintiffs have used a number of different methods of calculation to determine damages." *Id.* (quoting *Avery*, 45 F. App'x at 485). "One appropriate measure of damages" when the misappropriating defendant has saved research and manufacturing resources is "the reasonable royalty measure." *Id.* "Under long-standing case law" in the Sixth Circuit, "[t]o adopt a reasonable royalty measure of damages is to adopt and interpret, as well as may be, the fiction that a license was granted at the time of beginning the infringement, and then to determine what the license price should have been." *Id.* (citing *Egry Register Co. v. Standard Register Co.*, 23 F.2d 438, 443 (6th Cir. 1928); *Vitro Corp. v. Hall Chem. Co.*, 292 F.2d 678, 682-83 (6th Cir. 1961)). "[B]ecause the precise value of a trade secret may be difficult to determine, 'the proper measure is to calculate what the parties would have agreed to as a fair price for licensing the *defendant* to put the trade secret to the use the *defendant* intended at the time the misappropriation took place.'" *Id.* at 510-11 (quoting *Univ. Computing Co. v Lykes-Youngstown Corp.*, 504 F.2d 518, 539 (5th Cir. 1974)).

Plaintiffs do not have evidence of actual loss caused by the alleged misappropriation. And the Court has previously held that Plaintiffs are prevented from proceeding against Bickley and Robinson on a theory that Big Ass Fans was unjustly enriched because of the alleged misappropriation. (Doc. # 93). In an effort to circumvent

that Order, Plaintiffs now claim to be proceeding under KUTSA's "reasonable royalty" damage theory. (Doc. # 220 at 3). Specifically, Plaintiffs allege that the Individual Defendants "misappropriated Plaintiffs' proprietary information" in violation of the return-of-property provisions and KUTSA. (Doc. # 220 at 7). Therefore, Plaintiffs claim that they are entitled to a "reasonable royalty" based on the value of the information that was misappropriated. *Id.* And they intend to measure that royalty with evidence of their own IBL development costs.

Plaintiffs' attempts to seek damages against the Individual Defendants, based on the alleged benefit of Big Ass Fans, whether under a reasonable royalty theory or any other theory, continues to fail for one reason – Plaintiffs did not sue Big Ass Fans under KUTSA or the return-of-property provision. As Magistrate Judge Wier correctly held:

> [Big Ass Fans'] alleged ill-gotten profits, under an unjust enrichment theory, are only theoretically available as damages to Acuity under the KUTSA claim, *see* KRS 365.884 (permitting recovery of actual losses and otherwise unaccounted-for unjust enrichment amounts), but Acuity did not sue [Big Ass Fans] under KUTSA. (Doc. # 67 at 29). Acuity sued [Big Ass Fans] only on the tortious interference claim (a claim addressing competition and solicitation, not specifically trade secrets). *Id.* at 33. Thus, [Big Ass Fans'] potential liabilities are standard tort damages. *See Harrodsburg Indus. Warehousing, Inc. v. MIGS, LLC*, 182 S.W.3d 529, 533-34 (Ky. Ct. App. 2005) (citing *Restatement (Second) of Torts* § 766); *W. Union Tel. Co. v. Guard*, 139 S.W.2d 722, 727-28 (Ky. 1940) ("A person injured by the commission of a tort is entitled to actual pecuniary compensation for the injury sustained."). Acuity concedes that "[Big Ass Fans'] profits ... may not be available to Plaintiff under ... unjust enrichment." (Doc. # 87-1 at 8), but argues that [Big Ass Fans'] profits are "awardable as a measure of Plaintiff's actual loss." *Id.* (citing *Mangren Research & Dev. Corp. v. Nat'l Chem. Co., Inc.*, 87 F.3d 937, 945-46 (7th Cir. 1996)).
>
> Acuity's liability theory ... does not follow a straight path. Acuity seeks [Big Ass Fans'] financial information partly as a measure of Acuity's loss on which Bickley and Robinson may be liable.

(Doc. # 93 at 4).  After determining that the Seventh Circuit case cited by Plaintiffs did not lend support to their argument, or their discovery request, Magistrate Judge Wier discussed Sixth Circuit precedent on this issue:

> The Sixth Circuit, however, takes a more guarded approach in the Court's view.  *See Allied Erecting & Dismantling Co., Inc. v. Genesis Equip. & Mfg., Inc.*, 511 F. App'x 398, 403-04 (6th Cir. 2013) ("Adopting Allied's theory [that lost profits may be established *solely* on the basis of **profits the defendant gained** through its misappropriation] would allow recovery even in the absence of evidence that the plaintiff in fact suffered loss and would blur any distinction between the unjust-enrichment and lost-profits theories of damages." (italics in original; boldface added)).  While *Mangren*, from a foreign Circuit, provides some support for the general principle that Acuity's losses – by whichever actor induced – are recoverable, it does not follow that [Big Ass Fans] – not sued under the applicable count – must disclose corporate profits (or profitability factors) on demand.  *See id.*  Again, Acuity sues only Robinson and Bickley under KUTSA, and defendant identity matters under *Allied Erecting*.  *Ia.* (requiring that plaintiff "provide some demonstrable link between [defendant's] misappropriation and [plaintiff's] loss.").  The Court heeds the Sixth Circuit's warning not to "blur [the] distinction between the unjust-enrichment and lost-profits theories of damages" and remains mindful that the Sixth Circuit did not approve using third-party profits to calculate a plaintiff's damages to certain defendants.  *Ia.*
>
> Acuity can attempt to show it has suffered losses or that the individuals had illicit gains, but non-target [Big Ass Fans'] performance, on this record, is not part of the damage mix.

*Id.* at 6.  This analysis continues to be persuasive.  Plaintiffs cannot seek damages against the Individual Defendants based on non-target Big Ass Fans' profits, unjust gains, or under a reasonable royalty theory.  Therefore, Defendants' Motion for Reconsideration (Doc. # 209) is **granted** with respect to Plaintiffs' claim for damages based on their IBL development costs for the KUTSA and breach of the return-of-property provision.  However, this conclusion does not automatically warrant dismissal of those causes of action.

## e.   Nominal Damages and Exemplary Damages

With respect to the breach of the return-of-property provision, nominal damages are awardable.  Because Georgia law grants an injured party the right to damages in every breach of contract case, even "if there has been no actual damage, the injured party may recover nominal damages." *Botterbusch*, 609 S.E.2d at 146-47.  Therefore, although only nominal damages are possible, the Individual Defendants' Motion for Summary Judgment (Doc. # 120) is **denied** as to Count Two of Plaintiffs' Complaint, which alleges breach of contract based on the return-of-property provisions.

Likewise, KUTSA permits a court to award exemplary damages if "willful and malicious misappropriation exists." Ky. Rev. Stat. Ann. § 365.884(2).  Under Ky. Rev. Stat. Ann. § 411.184(1)(f), "punitive damages include exemplary damages and means damages, other than compensatory and nominal damages, awarded against a person to punish and to discourage him and others from similar conduct in the future." *Simpson Cty. v. Steeplechase Ass'n, Inc.*, 898 S.W.2d 523, 525 (Ky. Ct. App. 1995) (internal citations and quotation marks omitted).  While the Court has been unable to locate authority expressly permitting exemplary damages for violation of KUTSA when the party has not proved actual damages, the Court recognizes that Kentucky courts have long held that punitive damages may be awarded even when no actual damages exist.  *Mo-Jack Distrib., LLC*, 476 S.W.3d at 907; *see also Louisville & N.R. Co.*, 147 S.W. 411.  Therefore, the Plaintiffs' lack of actual damages does not require dismissal of their KUTSA claim, and the Individual Defendants' Motion for Summary Judgment (Doc. # 120) is **denied** as to Count Six of Plaintiffs' Complaint, which alleges violation of KUTSA.

71

## IV.    Conclusion

Accordingly, for the reasons stated herein,

**IT IS ORDERED** as follows:

(1)    Plaintiffs' Motion for Leave to Seal a Document (Doc. # 207) and Defendants' Motions for Leave to Seal a Document (Docs. # 211, 213, 216, and 223) are **granted** and the Clerk shall **maintain under seal** Docs. # 212, 212-1, 214, 214-1, 214-2, 214-3, 214-4, 215, 217, 224, 224-1, and 224-2.;

(2)    Defendants' Motion for Oral Argument (Doc. # 221) is **denied**;

(3)    Plaintiffs' Motion for Reconsideration of the Court's Summary Judgment Order (Doc. # 206) is **granted** and the following claims are reinstated: **Count One** (breach of the non-solicitation provision), **Count Three** (breach of the non-disclosure provision), **Count Four** (breach of the non-competition provision), and **Count Seven** (tortious interference with contractual relations);

(4)    Defendants Shane Bickley and Michael Robinson's Motion for Summary Judgment (Doc. # 120) is **denied**;

(5)    Defendant Delta T Corporation's Motion for Summary Judgment (Doc. # 121) is **denied**;

(6)    Defendants' Renewed Rule 37 Motion to Exclude (Doc. # 210) is **granted** with respect to: (1) lost profits arising out of the alleged sale of Big Ass Fans' High Bay LED product through Acuity's agents, (2) dilution and/or devaluation of Plaintiffs' share of the lighting market, (3) lost profits resulting from Defendants' alleged misappropriation of Plaintiffs' proprietary data, and (4) any cost savings accrued by Big Ass Fans, beyond Plaintiffs' claim for their IBL development costs;

(7)     Defendants' Motion for Reconsideration of the Court's Summary Judgment Order (Doc. # 209) is **denied**; and

(8)     The parties **shall file a Joint Status Report within twenty (20) days** of the date of the entry of this Order.  Within that report he parties shall provide suggested dates for a pretrial conference and trial, and indicate whether they are amenable to mediating the case.

This 31st day of March, 2017.

**Signed By:**

*David L. Bunning*   *DB*

**United States District Judge**

K:\DATA\Opinions\Lexington\13-366 Mtn for Reconsideration FINAL.wpd